837 A.2d 1231 (2003)
In re: A.R.M.F. and M.B.F., Minor Children
Involuntary Termination of Parental Rights of C.D.F., Natural Mother and H.E.F., Natural Father
Appeal of: C.D.F., Natural Mother and H.E.F., Natural Father
Superior Court of Pennsylvania.
Argued September 11, 2003.
Filed December 2, 2003.
*1232 Brad M. Jackson, Doylestown, for Bucks County, C.Y.S., for appellee. Deborah M. Steeves, Bristol, for appellants.
Before: GRACI, OLSZEWSKI and CAVANAUGH, JJ.
OLSZEWSKI, J.
¶ 1 H.E.F. (father) and C.D.F. (mother) filed consolidated appeals from the order of the trial court terminating their parental rights to their daughters, A.R.M.F. and M.B.F. (children). We affirm.
¶ 2 Mother gave birth to A.R.M.F. on July 13, 1997, and to M.B.F. on May 9, 1999. On November 4, 1999, the Bucks County Children & Youth Social Services Agency (Agency) filed a petition to adjudicate the children dependent and remove them from the home. In its petition, the *1233 Agency stated that it had escalating concerns for the children despite the fact that it had been providing services to father and mother since April of 1999. The petition alleged:
Most notably, the condition of the ... home is inappropriate and unsafe for young children. Though this issue has been addressed with the parents on several occasions, permanent and effective changes have not been made. Examples of this include cat feces on the floor, dangerous items such as pieces of broken furniture and stereo equipment precariously resting throughout the home and trash littered on the floors.
On several occasions, in-home workers have witnessed medicine on the counters, laundry detergent and cleaning solvents on the floor and in easy reach of the two-year old toddler.
Concerns also exist regarding supervision. Reports have been received to this Agency, that the toddler frequently gets outside without her parents knowledge. This is particularly alarming, as the home is located on a busy highway. It is unclear where the children spend their nights. Questions exist regarding [father's] nighttime paper route and the possibility of the children not having stable plans at night.
Petition to Adjudicate Dependency and to Enter an Order of Disposition, 11/4/1999. On November 5, 1999, the children were adjudicated dependent and placed in the physical and legal custody of the Agency.
¶ 3 On May 8, 2001, the Agency filed petitions for Involuntary Termination of Parental Rights and Duties of Natural Parents under Section 2511(a)(2), (5) and (8) of the Adoption Act. On March 3, 2003, the trial court granted the Agency's petition. The children were approximately six and four years of age at that time.
¶ 4 Father and mother raise three issues on appeal. First, they claim that the Agency failed to provide clear and convincing evidence for the involuntary termination of their parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5) and (8). Second, they argue that the Orphan's Court erred when it found that it would be in the best interest and welfare of the children to terminate mother and father's parental rights. Finally, the parents claim that the Orphan's Court erroneously denied their petition for expert witness fees.
¶ 5 Our standard of review in this case is as follows:
In reviewing an involuntary termination of parental rights, we must "employ a broad, comprehensive review of the record" in order to determine whether the termination order is supported by competent evidence. In re Adoption of T.M.F., 392 Pa.Super. 598, 573 A.2d 1035, 1044 (1990) (en banc); Matter of Adoption of G.T.M., 506 Pa. 44, 483 A.2d 1355 (1984). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the findings of the Orphans' Court, [we] will not reverse a hearing court's decision to terminate." In re Shives, 363 Pa.Super. 225, 525 A.2d 801, 802 (1987). While the scope of review is broad, we are limited to determining whether the order is supported by competent evidence and whether the court adequately considered the effect of such decree on the welfare of the child. In the Interest of L.S.G., 767 A.2d 587 (Pa.Super.2001). This court will affirm if competent evidence supports the trial court's findings, even if the record could also support the opposite result. Id. at 590.
In re J.T. & R.T., 817 A.2d 505, 508-09 (Pa.Super.2003). Moreover, the party seeking termination must have established grounds for termination by clear and convincing evidence. In re Julissa O., 746 A.2d 1137, 1139 (Pa.Super.2000). Clear *1234 and convincing evidence is defined as "testimony that is so `clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" Id. (quoting In re Adoption of Atencio, 539 Pa. 161, 650 A.2d 1064, 1066 (1994).
¶ 6 As stated above, the Agency petitioned to terminate mother and father's parental rights based on Section 2511(a)(2), (5) and (8) of the Adoption Act. 23 Pa.C.S.A. §§ 2511(a)(2), (5) and (8). The relevant parts of those sections state:
(a) GENERAL RULETHE RIGHTS OF A PARENT IN REGARD TO A CHILD MAY BE TERMINATED AFTER A PETITION FILED ON ANY OF THE FOLLOWING GROUNDS
(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
¶ 7 In order to terminate parental rights under Section 2511(a)(2), three elements must be met: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa.Super.2003) (citations omitted).
¶ 8 Under Section 2511(a)(5), the party moving for termination must show the following factors:
(1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child.
In re Adoption of M.E.P., 825 A.2d at 1273-74 (citing In re B.J.R., 397 Pa.Super. 11, 579 A.2d 906, 908 (1990).
¶ 9 Similarly, under Section 2511(a)(8), the moving party must demonstrate that "(1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of *1235 the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." In re Adoption of M.E.P., 825 A.2d at 1275-76.
¶ 10 The Orphans' Court held evidentiary hearings on July 23, 2001, September 23, 2001, January 14, 2002, April 15, 2002, and November 25, 2002, to consider the Agency's petition to involuntary terminate mother and father's parental rights to A.R.M.F. and M.B.F. The Agency presented the testimony of Dr. Joseph Schaller, a licensed psychologist; Kevin Nash, a social worker for Lutheran Children & Family Services; and Deborah Heagy, the Agency caseworker assigned to A.R.M.F. and M.B.F. The court found each of these witnesses to be credible. Trial Court Opinion, 3/3/2003, at 5, 8, and 13. We will not disturb a finding of credibility on appeal. See In re Adoption of M.E.P., 825 A.2d at 1273. The witnesses' testimony is summarized below.
TESTIMONY OF DR. JOSEPH SCHALLER
¶ 11 In January of 2000, about two months after A.R.M.F. and M.B.F. were removed from mother and father's home, the Agency requested that Dr. Joseph Schaller evaluate mother and father to determine whether they could be reunited with their children. N.T., 7/23/2001, at 17. To aid him in his evaluation, Dr. Schaller conducted the Wechsler Adult Intelligence Test on both mother and father.
¶ 12 The test showed that mother's full scale intelligence quota (IQ) is 73, which is below 95 percent of the population. Id. at 17-18. A score of 70 is the point at which someone would be considered mentally retarded. Id. at 18. Dr. Schaller opined that mother has "some limitation in cognitive functioning which would result in the kind of diminished flexibility and diminished capacity to deal with more complex and unstructured situations." Id. at 19. He expressed concern over her ability to maintain emotional control or emotional stability. Id. Dr. Schaller concluded that mother would need extensive intervention and support by family members or social services agencies in order to develop parenting skills and observe her interact with her children. Id. at 19-20.
¶ 13 Father's test score indicated that his IQ is 64, which is in the extremely low classification and in the upper range of what would be considered mental retardation. N.T., 7/23/2001, at 24. Dr. Schaller observed that father appears to be more capable than he may actually be, and that his capacity to deal with stressful and unstructured situations would be lower than one would assume just by talking to him. Id. at 25.
¶ 14 In order to be reunited with their children, Dr. Schaller recommended to the Agency that mother and father should strive to maintain a stable marriage, without excessive tension and arguing, and one where they would be together physically and emotionally. Id. at 20-21. He also emphasized the importance of individual, couple, and family counseling. Id. at 21-22, 26.
¶ 15 In February 2001, the Agency requested that Dr. Schaller evaluate mother and father a second time because they had not successfully complied with his recommendations, and there were additional factors that raised the Agency's concern. Id. at 28. Father admitted that he had been away from the household for several months due to conflict between him and mother, that he was not employed, and that they had difficulty relating to some of the people providing in-home support. Id. at 29-30. Dr. Schaller also noted that mother was "rigid" and inflexible, she had a great deal of difficulty accepting her need for support, she often minimized that *1236 need, and she resented the efforts of people to help her. Id. at 30-31.
¶ 16 Dr. Schaller concluded that father and mother would be capable of meeting the needs of their children only under fairly optimal conditions, which did not exist then or at the time of his hearing testimony. Id. at 33.
TESTIMONY OF KEVIN NASH
¶ 17 Kevin Nash is employed as a social worker by Lutheran Children & Family Services and has been A.R.M.F. and M.B.F.'s caseworker since April 17, 2000. N.T., 7/23/01, at 51. Mr. Nash served as the primary supervisor for visits between the children and their parents at the parents' home. Id.
¶ 18 Mr. Nash testified that when he began visiting mother and father's home, there was a bleach bottle in the bathroom that was accessible to the children, and he told the parents that it needed to be placed out of reach of the children. Id. The parents did not remove the bottle until several visits later, after being advised numerous times to do so. Id.
¶ 19 Mr. Nash testified that on October 19, 2000, A.R.M.F., then age 3, tried to pull a car seat off a pile of stacked boxes, almost pulling it down on her. Id. at 54. Mr. Nash prevented the accident. Mr. Nash noted that the home was extremely cluttered with bags of clothes, extra dressers, furniture, boxes containing unknown items, and extra things for the children. Id. at 58. He also stated that there were foul odors in the home due to the cat's liter box. Id. at 58. Additionally, during the that visit, father told Mr. Nash that he planned to move to Wildwood, New Jersey, leaving mother with Joey, father's child from a previous relationship. Id. at 59.
¶ 20 Further incidents occurred during visits on March 8, and March 15, 2001. During those visits, Mr. Nash observed A.R.M.F. pull a sharp compass out of her crayon box, which had to be taken from her by a social worker. Id. at 62. Also, Mr. Nash testified that mother attempted to serve expired yogurt to the children. Id. at 63.
¶ 21 On March 30, 2001, Mr. Nash and mother returned to the home after shopping at K-Mart. When they returned, the home was in disarray. "There [were] different desk pieces and drawers and cabinets all over the living room, there were different chairs, a lot of chairs in the living room at the time we had most of the visits." Id. at 64. On that same day, M.B.F. was rooting around in boxes and mother's purse and she got a hold of a sample package of Tylenol. Id. at 64-65. Mr. Nash had to take the Tylenol from the child.
¶ 22 In April of 2001, the children were in three other precarious situations. On April 5, mother was holding M.B.F. (then 23 months old) in a swing and pushing her. Id. at 65. At one point, mother let go of M.B.F.'s hands and the child fell 18 to 24 inches to the ground and landed on her back. Id. On April 26, A.R.M.F. and M.B.F. were being supervised by mother when A.R.M.F. wandered into a dangerous area under a tree where branches were being pulled down. Id. at 67. Mr. Nash had to rebuke the child, who then ran back to mother. Id. Following that incident, but while the branches were still being pulled down, A.R.M.F. wandered to a pile of old wood that had rusty nails sticking out of it. Id. at 67-68. Mother seemed not to notice the precarious situation. Id.
¶ 23 Mr. Nash testified that he had concerns for A.R.M.F. and M.B.F. He stated, "My concerns mostly surround the consistent display of poor judgment by the parents. There are obviously some safety concerns that stem from that poor judgment, supervision concerns stem from that poor judgment." Id. at 71.
*1237 ¶ 24 Mr. Nash also commented on the interpersonal relationships between the parents and A.R.M.F. and M.B.F. He stated that the children identify mostly with their half-brother, Joey. N.T., 1/14/2002, at 118.
Other than that, the visit basically consists of the girls coming into the home, grabbing some toys and playing basically on their own.... [T]hey are supervised but there's very little interaction between mom and dad and the kids, except for when, if they have a snack ready for them, they'll bring the snack to them and give it to them.
Id. Mr. Nash testified that on another occasion, he was to bring the children to meet father, mother, and Joey at a Wal-Mart for family pictures. Id. at 119-20. Father did not show up, and he and Joey did not get to be in the family picture. Id. Joey was quite upset about that situation. Id. During the visit, mother exclaimed that "she felt like she was raising three children with [father] in the house, and was worried about when the [children] come back that she wouldn't be able to do it without his assistance, without his help." Id. at 120. Furthermore, Mr. Nash testified that A.R.M.F. does not acknowledge Shannon's existence, and M.B.F. takes very limited interest in Shannon. Id. at 120-21.
TESTIMONY OF DEBORAH HEAGY
¶ 25 Ms. Heagy is employed as a caseworker for Bucks County Children & Youth (Agency). She has been assigned to A.R.M.F. and M.B.F. since January of 2000. Ms. Heagy provided testimony concerning mother and father's capacity to parent A.R.M.F. and M.B.F. She testified that the Agency has the same concerns as it had when it filed for involuntary termination of parental rights in November 1999. N.T., 7/23/01, at 94.
¶ 26 Ms. Heagy testified about the parents' relationship. She believes that because mother and father have shown poor judgment in their parenting, they need to rely on one another and be stronger as a unit. Id. at 102. Sometime in 2000, however, the parents thought they were going to be evicted from their apartment. "[T]he family's plan was for [father] to move to Wildwood with his friends, for Joey to move to Wildwood with I believe [father's] relatives, and for [mother] to live in a car parked on the apartment's property." Id. at 102-03.
¶ 27 Ms. Heagy stated that father has a pattern of "leaving the home or wanting to leave the home or [mother] kicking him out or wanting to. He has left many times, even for a few days at a time, and come back." Id. at 95. He told Ms. Heagy that he wanted to renew his driver's license in New Jersey because he intended to move there. Id. at 109. On October 20, 2000, he stated to Ms. Heagy that he was just renting a room from mother and would stay there until he could move out. N.T., 1/14/2002, at 42-43. Again on November 11, 2000, father said he was moving out unless mother got rid of their two cats. Id. at 43.
¶ 28 Ms. Heagy testified that mother told her when father leaves the home, she gets lonely and would knock on neighbors' doors for company. Id. at 100. Ms. Heagy recounted that before the Agency took A.R.M.F. and M.B.F. into their custody, the Agency found that mother was taking the children with father on his two a.m.-to-six a.m. paper route because she was afraid to be alone in the apartment without him. Id.
¶ 29 Ms. Heagy stated that she has heard father talk about nine children that he believes he has with numerous women. Id. at 95. He continues to have contact with Angela Blunk, the mother of his son Charles, and his ex-wife Jane Szalma. Id. at 97. Angela actually lived with mother *1238 and father in October 2000. Id. Ms. Heagy testified that mother did not like it when Angela lived with them, nor did she like it when father invited at least five other people to live with them in their apartment, including Angela's son Chad. Id. Mark is another individual that father invited to stay at the home against mother's wishes. Mark is mother's former boyfriend. Id. at 110.
¶ 30 While Angela was living at the home, there was an incident involving mother and Charles. Mother allegedly raked Charles' head with a fork. Id. at 114. According to Ms. Heagy, mother told her that Angela was not present, Charles was arguing with her, and that she may have accidentally hit him with the fork. Id.
¶ 31 Ms. Heagy testified that the parents' living situation is a constant stress on their ability to parent and having all the different people in the home adds to the instability of the marriage. Id. at 115. Moreover, father does not seem to recognize this problem or care that mother does not like these people in the home. Shannon, who was born to mother and father on May 27, 2001, was recently returned to them after being in the temporary custody of the Agency. Id. at 98. Shannon's return was prefaced on extensive in-home services provided to the family. Id. Only one week after Shannon's homecoming, however, father invited Chad back into the home. Id. at 99.
¶ 32 Ms. Heagy testified that mother and father already receive thirty hours of in-home services each week. Id. at 118. She stated that the Agency does not believe those services would be sufficient for them to support A.R.M.F. and M.B.F. because it is concerned what will happen when the workers leave. Id. Ms. Heagy stated that the parents would need in-home service whenever the children are awake in order for the children to be returned home. Id. at 52.
¶ 33 Ms. Heagy told the court that on one visit to the home, she took A.R.M.F. to the bathroom to wash her hands and found razor blades in the sink. N.T., 1/14/2002, at 37. There was no soap, no towel, and there was trash on the floor, which A.R.M.F. started to clean up. Id. at 37-38. Ms. Heagy also stated that cat feces were found in the home on numerous occasions and the parents were asked repeatedly to pick up the mess. Id. at 80. She stated that cat feces had been found in the home within the month prior to the hearing. Id.
¶ 34 According to Ms. Heagy, mother is not always open to suggestions of her supporters. In March of 2000, mother was trying to put on M.B.F.'s coatM.B.F. was a little under two years old at the time. Id. at 112. As mother was putting on M.B.F.'s coat, the child's thumb got bent back in the sleeve. Id. Ms. Heagy suggested that mother reach in to pull the child's hand through, but mother said "she is able to take care of her own children without caseworkers watching her." Id. Another incident occurred on November 2, 2000. According to Ms. Heagy, mother did not heed the advice of a foster care worker to tie her shoelace, and she tripped and fell while carrying M.B.F. N.T., 1/14/2002, at 33-34. Ms. Heagy stated that mother sometimes argues with her when she makes suggestions. N.T., 7/23/2001, at 113.
¶ 35 Ms. Heagy also testified to mother's physical ability. She stated that mother suffers from cerebral palsy, which affects her gait, speech, and arm strength. N.T., 7/23/01, at 101. In fact, mother has been advised not to carry the baby from room to room, but to put her in a stroller or carrier. Id.
*1239 ¶ 36 Additionally, Ms. Heagy testified that the parents have not displayed a commitment to receiving counseling. Mother and father attended couples counseling (with Joey) from June to September 2000, and they had family counseling from January to May 2001. Id. at 104. At one point, when the parents were not going to counseling, father said he was too busy and claimed that gas was too expensive. Id. at 104-05. But Ms. Heagy said that father would make longer trips for other reasons, and he was not in counseling because he did not want to participate. Id. at 105. Father has never participated in individual counseling. Id.
¶ 37 Ms. Heagy also testified about the welfare of A.R.M.F. and M.B.F. and their current living situation. She stated that they are in a foster family with Lutheran Family Services and have been in that family since April of 2000. Id. at 118-19. Ms. Heagy testified that the children and their foster parents seem to be "very well bonded." Id. at 120. "The foster family tries to provide structure for the [children], and they are very loving.... They seem to be very comfortable in the home." Id. Moreover, the family has expressed their desire to adopt the children if the children are not reunified with their biological parents. Id. at 120-21.
¶ 38 Mother's relationship to her children on the other hand, seems to be strained. Ms. Heagy testified that mother expects the children to initiate play with her, instead of taking the initiative herself, and she gets upset when they do not. N.T., 1/14/2002, at 94. Ms. Heagy stated further that the introduction of Shannon into the home would make it more difficult for mother and father to care for A.R.M.F. and M.B.F. Id. at 95. Ms. Heagy concluded that the Agency believes that the termination of mother and father's parental rights would best serve the needs and welfare of the children. Id. at 121.
¶ 39 After a thorough review of the record, we conclude that the Agency presented clear and convincing evidence to justify the order entered by the Orphans' Court. As required by Section 2511(a)(2) of the Adoption Act, the Agency showed that father and mother continue in their incapacity to parent A.R.M.F. and M.B.F. through their consistent display of poor judgment, marital instability, and lack of commitment to counseling. Clearly, such actions and inaction by the parents has caused the children to be without essential parental care. As stated above, the children have been placed in danger multiple times. It seems highly probable that the children would be placed in perilous positions in the future if they were returned to their biological parents. Moreover, it appears to this Court that mother and father are either unable or unwilling to remedy their incapacity. Accordingly, we find that the Orphan's Court did not abuse its discretion or commit an error of law when it ordered the parental rights of mother and father to be terminated.
¶ 40 The Agency also met their burden of proof under Sections 2511(a)(5) and (8). It is uncontested that the children had been removed from the parents' home by court order for over twelve months, which satisfies the requirements under both Sections 2511(a)(5) and (8). Also, the conditions which led to the removal of the children continue to exist. The general condition of the home is constantly cluttered and also dangerous, as evidenced by incidents involving razor blades, Tylenol, a car seat, cat feces, and a bleach bottle. In addition, it is apparent that supervision problems have not been remedied, as A.R.M.F. wandered into dangerous situations twice. Further, the parents cannot or will not remedy the problems within a reasonable time period. Moreover, the court heard testimony concerning the ineffectiveness of the in-home services that *1240 have already been provided to mother and father to remedy the problems that led to the children's removal, and the fact that they are not likely to be effective in the future.
¶ 41 Finally, the Agency also showed that the termination of parental rights would best serve the needs and welfare of the children. A.R.M.F. and M.B.F. are now six and four years old, respectively. They have lived in a stable foster home for over three years, and they are well bonded with their foster parents. Furthermore, the foster parents have expressed a desire to adopt the children. Testimony by Mr. Nash and Ms. Heagy showed that the children are not well bonded with their biological parents. While they enjoy going to their weekly visits, there is little interaction between the parents and A.R.M.F. and M.B.F.
¶ 42 Accordingly, we find that the Orphan's Court properly terminated the parental rights of mother and father. The court did not abuse its discretion, nor did it commit an error of law. Rather, it relied on competent evidence presented by the Agency.
¶ 43 The parents' third claim that the Orphan's Court erroneously denied their request for expert fees is without merit. The court denied the parents' request for fees on September 18, 2001. The parents, however, did not object or refer to the court's order at any of the hearings that followed. Moreover, the parents presented an expert witness at the hearings without having secured fees from the court. Therefore, we do not see how the parents were prejudiced by the court's order.
¶ 44 Order AFFIRMED.
¶ 45 Judge CAVANAUGH files a Dissenting Opinion.
CAVANAUGH, J., Dissenting.
¶ 1 I dissent.
¶ 2 The majority affirms because it finds that sufficient competent evidence was presented under the clear and convincing standard to support the trial court's conclusion. I disagree. I would find that the evidence offered in support of termination fell far short of the clear and convincing standard.
¶ 3 It appears to me that the trial court terminated appellants' parental rights because it found that they showed a pattern of poor judgment which might, in the future, result in some indeterminate harm to the children. No prior event of serious harm was shown. Although parents suffer from intellectual deficits, it was essentially undisputed that the children had not suffered abuse or neglect as a consequence. Further, I would conclude that whatever the perceived deficiencies of appellants' abilities to diligently parent their children might be, evidence of parents' willingness to remediate those deficiencies was shown. Part of the court's rationale for termination was its conclusion that appellants refused to participate in, or to be capable of benefiting from, services such as counseling and supervision provided by the social service agencies charged with preserving the family unit. In my view, the evidence presented at trial did not clearly and convincingly support that conclusion at all. Rather, I believe the evidence showed that the parents have consistently permitted social service workers to provide countless hours of in-home services and counseling and that the parents and children have, in fact, benefited therefrom. Thus, I dissent. I would reverse the orders which terminated appellants' parental rights.
¶ 4 In reviewing an order involving termination of parental rights, our scope of review is broad, and all the evidence as *1241 well as the hearing court's factual and legal determinations will be considered. In re N.C., 763 A.2d 913, 917 (Pa.Super.2000).
In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.
In re Julissa O., 746 A.2d 1137, 1139 (Pa.Super.2000) (quoting In re Adoption of Atencio, 539 Pa. 161, 650 A.2d 1064, 1066 (1994)) (citations omitted).
¶ 5 The facts, as gleaned from my review of the record, show that mother suffers from cerebral palsy which causes her, among other things, to walk somewhat unsteadily and speak somewhat unclearly. Mother has a full-scale I.Q. of 73, as measured on the Wechsler Scale, which places her in the "borderline intellectual functioning" category of normal intelligence, i.e., mother is of low-normal intelligence, a category which is sometimes referred to as "borderline" mentally retarded. Father has an I.Q. of 64, measured via the same test-scale instrument, which places him in the "mild" range of mental retardation.
¶ 6 Father and mother apparently came to the attention of local social service providers in 1997, prior to the birth of A.R.M.F.[1] Among other things, mother received in-home prenatal and postnatal counseling and training from nurses provided by the Bucks County Department of Health's maternal care outreach program. The training sessions, which included unannounced visits, occurred at least bi-weekly and continued for more than two years. The evidence showed, as per the testimony of visiting nurse Joan Linus, that the children were adequately cared for by parents during that period. Although the home was untidy or cluttered at times, Nurse Linus testified that both A.R.M.F. and M.B.F. were adequately clothed and fed, that the children were healthy, received regularly medical care and that there were no issues regarding lack of hygiene, sanitation or safety in the home.
¶ 7 Nonetheless, in April of 1999, Bucks County Children and Youth Social Services Agency (CYS) began providing "general protective services" for the family. Apparently, neighbors had reported that the children were sometimes unattended and that the family home was filthy. Deborah Heagy, a CYS caseworker assigned to the family in January, 2000, testified that protective services had begun the previous April because mother and father "demonstrated serious lapses in judgment in parenting abilities. Concerns exist[ed] regarding supervision and housekeeping."
¶ 8 On November 4, 1999, CYS filed a petition to adjudicate the children dependent. The petition specifically alleged that:
the condition of the [family] home is inappropriate and unsafe for young children....Examples of this include cat feces on the floor, dangerous items such as pieces of broken furniture and stereo *1242 equipment precariously resting throughout the home and trash littered on the floors.
On several occasions, in-home workers have witnessed medicine on the counters, laundry detergents and cleaning solvents on the floor and in easy reach of the two-year [old] toddler.
Concerns also exist regarding supervision. Reports have been received to this Agency, that the toddler frequently gets outside without her parents knowledge. This is particularly alarming, as the home is located on a busy highway.
¶ 9 On November 5, 1999, the subject children were adjudicated dependent and placed into the temporary custody of CYS. From that date forward, mother and father received at least thirty hours per week of in-home services and they attended numerous hours of counseling sessions, both individually and as a couple. The children were placed together in a foster home in January of 2000, where they have resided since.
¶ 10 Mother and father steadfastly maintained regular weekly visits with the children. Most of the visits took place in the family home and were supervised by social workers from both Ken-Crest Personal Support Services and Lutheran Children & Family Services. Six-month reviews were conducted by the court. The reviews in April of 2000 and in October of 2000 revealed that parents were making satisfactory progress toward the goal of family reunification.
¶ 11 In November of 2000, mother was reportedly arrested for endangering the welfare of a child following an incident in her home in which she scraped father's visiting teenage son from a previous marriage on the forehead with a fork.[2] The charges were dropped shortly thereafter and a subsequent child protective services investigation reported that the incident was unfounded. Nonetheless, in February of 2001, CYS petitioned to change the placement goal from reunification to adoption and in May, 2001, CYS petitioned to involuntarily terminate the parental rights of mother and father.
¶ 12 Evidentiary hearings on the involuntary termination petition were conducted on July 23rd and September 23rd of 2001 and on January 14th, April 15th and November 25th of 2002. CYS presented the testimony of psychologist Joseph Schaller, Lutheran C & FS social worker Kevin Nash and CYS caseworker Ms. Heagy. Parents presented the testimony of licensed registered nurse Ann Gordon, Ken-Crest personal support coordinator Barbara Jolly, Ken-Crest personal support worker Shannon Dunsmore, parents' neighbor Carolyn Scott, nurse Joan Linus and psychologist John E. Thvedt. Mother and father testified themselves as well.
¶ 13 Dr. Schaller, who evaluated mother and father for CYS, testified that mother, although "anxious" about the "evaluation situation" was nonetheless "pleasant [and] cooperative." He testified that "she seemed very concerned about her children and distraught that she was separated from them." He testified that his "primary concern" regarding mother's parenting ability was her diminished cognitive ability:
[CYS' counsel] Q. What did you observe that could potentially limit [mother's] ability to parent?
A. I think my primary concern was that there certainly was some limitation in cognitive functioning which would result in the kind of diminished flexibility *1243 and diminished capacity to deal with more complex and unstructured situations. My concern with [mother] has to do with the fact that her internal resources were somewhat limited.
Q. What do you mean by "internal resources?"
A. Her cognitive ability, just her available knowledge of the world and how things worked in a more practical level, and her capacity to maintain certain emotional control and emotional stability. These are the kinds of internal resources I had questions about.
¶ 14 Dr. Schaller testified that father has an "engaging personality, he can be quite friendly, he articulates wellin other words, he can use language well, and he also, you know, presents himself I think as having a number of skills." Given father's objective cognitive deficits, however, Dr. Schaller concluded that that father "appears to be more capable than he may actually be."
¶ 15 Ultimately, Dr. Schaller concluded, with respect to both parents' ability to successfully parent the subject children:
Q. What is your conclusion, sir, as to their ability and capacity to physically care and provide parental care for their children?
A. It was my impression that their ability and their capacity was extremely limited by the things that you have reviewed, some of the internal difficulties [cognitive and/or emotional deficits] and the lack of external supports [family help and/or provider agency services], that only under fairly optimal situations did I view them as being capable of being successful in meeting the needs of these two children.
Q. And as the case was presented to you, did those optimal situations exist?
A. Apparently not.
¶ 16 Mr. Nash testified for CYS that he had spent many hours, approximately thirty 90 minute sessions, observing the conditions of the parents' home and their interactions with the subject children during weekly supervised visits. He testified that the "home was mostly in order, pretty much clean." He testified to "occasional things" which required remediation, such as "a bleach bottle in the bathroom that they had to put away, and most of those recommendations were heeded." There was also a period of time when the home was cluttered with boxes and bags of clothing, but those were eventually removed. He testified that during one visit, a pointy drawing tool, either a protractor or compass, was removed from a box of crayons, and that a continuing issue of cat-box odor and cat-feces on the floor had been resolved. He testified to finding an unopened sample package of Tylenol in the possession of one of the children during a visit. He testified that on one visit, the elder of the girls fell out of a swing while mother was supervising. Apparently mother had been swinging the child but lost her grip and the child fell down. He testified that as a result, mother "was very upset, felt very badly, wanted me to understand she didn't do that on purpose. I told her I understood. She was very remorseful."
¶ 17 Mr. Nash's direct testimony concluded as follows:
Q. Mr. Nash, from all the visits that you supervised and as a result of your observations, do you have some concerns for the children?
A. Yes.
Q. What are those concerns, sir?
A. My concerns mostly surround the consistent display of poor judgment by the parents. There are obviously some safety concerns that stem from the poor judgment, supervision concerns stem from that poor judgment.
*1244 ¶ 18 Ms. Heagy testified for CYS to substantially the same events. She added that there have been times when mother and father argue and that father sometimes leaves the home for indeterminate periods of time following arguments with mother. This was of concern to her because "I believe that they [parents] have shown some poor judgment in their parenting, and I think they need to rely on one another to help them be stronger as a unit." Ms. Heagy testified that she has told both parents that "in order to get their kids back ... I have emphasized counseling, I have emphasized showing good judgment, demonstrating good judgment in the supervision of the children. Those are the things I have emphasized most."
¶ 19 Mother and father both testified that their occasional arguments primarily revolve around blaming each other for the fact that the children were removed from the home. It was shown that mother and father received couples counseling from June through September of 2000. They received family counseling from January through May of 2001. Mother had individual counseling from November of 1999 through September of 2000, which terminated only when the therapist she was seeing left the provider agency. Mother and father received a certificate of achievement presented by The Parenting Resource and Education Network of Lakeside Youth Service dated January 17, 2000, for completing 16 sessions of parenting education.
¶ 20 LRN Ann Gordon testified for mother and father that she has been in their home on "numerous occasions," encompassing approximately 100 visits, beginning in February of 2001, prior to the birth of their third child. The subject children were present at perhaps six of those visits. Nurse Gordon's opinion was that mother had more than enough ability to properly attend to the needs of all of her children. She also testified that father, who was present during perhaps 30 of the 100 visits[3], is "very good with the children." When asked on cross-examination about mother's intellectual deficits, Nurse Gordon testified that they are insignificant and that mother is "very high functioning with her handicap."
¶ 21 Barbara Jolly, a Ken-Crest support services provider testified for mother and father as well. Ms. Jolly testified that mother does have some "mild cognitive limitations" which do not interfere with her ability to manage her activities of daily living:
...[Mother] manages all of her financial affairs. She keeps a checkbook. She does banking. She pays bills. She needs no help with that. So, certainly she has the judgment[,] I think that proves a certain level of judgment that a lot of people that I work with who receive our services do not have.
Q. [by CYS' counsel] Okay. What about her other daily needs, does she have limitations in that respect?
A. Well, I mean, [mother] takes care of all of her personal hygiene. She shops for her own clothing. She shops for food for the household, she provides meals for everyone in the household, and they may not be a gourmet level but she provides meals and she does have in the house the things she needs for them.
¶ 22 Ms. Jolly additionally prepared a two-page report in February of 2001, which was admitted into evidence and which detailed the numerous services, including counseling, that parents are receiving and from which they are benefiting. *1245 She noted the large number of visits that parents have had with the subject children which either she or her staff have observed. She reported that conditions in the home had steadily improved. She reported that the house was organized, appropriately clean and that any safety hazards had been removed. She noted that mother and father are "getting along very well and are really supporting each other as partners." The report concluded that "[i]t is my opinion that [mother] possesses the skills and knowledge to provide a safe, healthy home for [M.B.F.] and [A.R.M.F.]. With continued support from Ken-Crest services, I feel she should be re-united with her daughters."
¶ 23 Nurse Linus, who provided regular, on-going services to parents and the subject children in the family's home from approximately June of 1997, until January of 2000, testified on direct examination as follows:
Q. Were you aware that the children were going to be removed from the house?
A. No. I learned of it after the fact.
....
Q. When you instructed the [parents] as to care or safety, did you have any problem communicating with them?
A. No. A lot of interaction took place between the three of us, because [father] was usually home in the afternoon.
Q. And did they [parents] do what you instructed them to do?
A. Yes.
Q. Did you ever have a feeling that they just weren't getting what you were telling them to do?
A. No, I didn't feel that way, no.
Q. Did you feel that the children were neglected?
A. No.
Q. Did you ever feel that they were abused?
A. No.
Q. Did you ever feel that they were improperly supervised?
A. No.
¶ 24 It was further shown that Nurse Linus and Nurse Gordon were "mandated reporters," i.e., they were required by law to report to CYS any observations of abuse or neglect they might make regarding parents on their caseload. When Nurse Linus was asked why she never made any reports to CYS about the instant parents, she replied, "Because I felt as if the children were being adequately cared for. I felt even though things may not be the neatest, you know, I felt as if they were really working hard to be good parents. I don't think the kids were ever in any danger."
¶ 25 The court determined that the petitioning agency had proven by clear and convincing evidence that grounds for termination existed under any of the following three distinct statutory bases:
§ 2511. Grounds for involuntary termination
(a) General Rule.The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
....
(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
....
(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the *1246 removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
....
(8) The child has been removed from the care of the parent by the court, or under a voluntary agreement with the agency, 12 months have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the children continue to exist and termination of parental rights would best serve the needs and welfare of the child.
23 Pa.C.S.A. §§ 2511(a)(2), (5), (8).
¶ 26 In terminating the parental rights of mother and father, the court opined as follows:
[Father] and [mother] lack the capacity to parent [A.R.M.F] and [M.B.F.]. Their incapacity has threatened the safety of the children. Since the children's removal from the home the [parents] have been provided with many support services by the Agency. However, they have not availed themselves of the services and corrected their incapacity to parent. Were [A.R.M.F] and [M.B.F.] to be returned to the [parents'] household, the children's safety would still be at risk. The conditions which led to the Adjudication of Dependency have not been remedied nor will they be. Since the parents refuse to acknowledge the need for services as well as accept the services offered, the parents cannot remedy the conditions which led to the placement within a reasonable period of time.
¶ 27 After careful review, I disagree. Although I realize that the evidence clearly showed that both parents suffer irremediably from intellectual deficits and mother from permanent physical disability, I cannot conclude that the evidence clearly and convincingly showed that the children were abused, neglected or harmed thereby or were caused thereby to be without essential parental care, control or subsistence necessary for their physical or mental well-being. Moreover, although the evidence showed that the cleanliness of the family home has always been inconsistent and that the parents' attendance at some counseling arrangements outside the home has been spotty at times, there was no evidence that parents offered outright refusal to attend any scheduled training or counseling. Indeed, the record is replete with evidence of training, counseling and services actually attended and beneficially used, although again perhaps not consistently.
¶ 28 I further recognize that the matters involved in this case
are of the utmost importance and seriousness. A parent's right to raise his child is one of the most basic rights of western civilization. It is so much a part of our cultural tradition that our courts have enshrined it with constitutional protection despite its absence from the document's text.
In re Adoption of J.J., 366 Pa.Super. 94, 530 A.2d 908, 913 (Pa.Super.1987) (citing Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). This court recently opined:
Almost one-half century ago, this court, per the Honorable Robert Woodside, eloquently stated that the law should not presume to build a "perfect" home for those unfortunate children whose mothers and fathers are less than perfect parents.

*1247 The family is an institution which preceded governments. Its sanctity was universally recognized before judges or statutes or welfare organizations were known to man. The right of a child to a mother and a mother to a child are rights created by natural law. They are rights attributable to the nature of mankind rather than to the enactments of law.
...
A child cannot be declared "neglected" merely because his condition might be improved by changing his parents. The welfare of many children might be served by taking them from their homes and placing them in what the officials may consider a better home. But the Juvenile Court Law was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.
In Re Adoption of S.M., 816 A.2d 1117, 1123-24 (Pa.Super.2003) (quoting In Re Rinker, 180 Pa.Super. 143, 117 A.2d 780, 783 (1955)).
¶ 29 To the above list of good intentions I would add that the law does not provide a vehicle to take the children of the functioning mentally retarded who sometimes display poor judgment and give them to presumed insightful persons of normal intelligence. It is to the everlasting credit of our society that we have marshaled resources to provide services to parents who are sometimes less than skilled in the discharge of their parental responsibilities. With the continued provision of these services, there is no reason not to expect that the reason for their existence, i.e., preservation of the family unit, may not be achieved.
¶ 30 I would reverse the orders of involuntary termination of parental rights.
NOTES
[1] A.R.M.F. was born in July of 1997. Mother and father married in July of 1998. M.B.F. was born in May of 1999.
[2] Father reportedly has three sons from former unions. Mother and father are the parents of two additional children born to them since the subject children were removed from the home. There are no issues before us concerning the other children.
[3] Father has been variously employed as a handy-man, mechanic and delivery person, duties which keep him out of the house during many day-time visits.