J-S42001-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: K.F., MOTHER | : | |
| | : | No. 1054 MDA 2024 |

Appeal from the Order Entered June 25, 2024
In the Court of Common Pleas of Adams County Orphans' Court at No(s):
RT-8-2024

BEFORE:  LAZARUS, P.J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY LAZARUS, P.J.:          **FILED: FEBRUARY 14, 2025**

K.F. (Mother) appeals from the order, entered in the Court of Common Pleas of Adams County Orphans' Court, terminating her parental rights to her daughter, A.M.F. (Child) (born April 2018), pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8) and (10) of the Adoption Act.[1]  We affirm.

This case came to the attention of Adams County Children and Youth Services (Agency) as a result of concerns that Child was the victim of abuse and sex trafficking.  Child was adjudicated dependent on January 3, 2023. On April 4, 2024, a permanency review hearing was held at which time Child remained in Agency custody for foster care placement.  Following the conclusion of the hearing, the court determined that aggravated

_____

[1] 23 Pa.C.S.A. §§ 2101-2938.

circumstances existed as to both parents due to a finding of abuse, and the Agency was excused from further efforts to reunify the family.

On February 20, 2024, the court issued an order finding that Child was a victim of abuse at the hands of Mother and A.M.-C. (Father),[2] as defined by 23 Pa.C.S.A. § 6303(b.1)(4) of the Child Protective Services Law (CPSL).[3]  On September 24, 2024, a panel of this Court affirmed the February 20, 2024 order.  **See In the Interest of: A.M.F.**, **a Minor**, **Appeal of: A.M.-C., Father**, 377 MDA 2024 (Pa. Super. filed Sept. 24, 2024 (unpublished memorandum decision); **In the Interest of: A.M.F.**, **a Minor**, **Appeal of: K.F.**, **Mother**, 413 MDA 2024 (Pa. Super. filed Sept. 24, 2024) (unpublished memorandum decision).[4]

_____

[2] Father has also filed an appeal from the order terminating his parental rights at a separate docket, 1077 MDA 2024.

[3] Section 6303(b.1)(4) of the CPSL provides:

> **(b.1)  Child abuse**.--The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> * * *
>
>  (4) Causing sexual abuse or exploitation of a child through any act or failure to act.

23 Pa.C.S.A. § 6303(b.1)(4).

[4] At the permanency review hearing on May 2, 2023, Amanda Evans-Freet, Child's therapist, testified concerning numerous disturbing disclosures made by Child. The disclosures consistently referenced "strangers" coming into her bedroom and putting things in her butt. Child indicated that strangers used to come to Mother's house and also put things up her butt.  Child repeatedly
*(Footnote Continued Next Page)*

indicated that she is not allowed to talk about it and if she does, Father and paternal grandmother "will kill you and get me." Child talked about keeping the strangers happy by rubbing their bellies and making "their snakes happy." She distinguished her prior foster father by stating, "Daddy Derek doesn't put things in my butt and I don't have to sleep with him." According to Evans-Freet, Child's verbal statements were corroborated by her nonverbal and physical symptoms. For example, when Child stated, "I got married once. When you get married, you have to get naked and the person you married is allowed to touch you[,]" Evans-Freet observed Child grabbing her genitals over her clothing. Similarly, when making these disclosures, Child would grab her private area and run to the bathroom. Finally, Evans-Freet stated that Child has regressed in her therapy and exhibited psychosomatic symptoms after receiving a birthday gift from Mother. At the conclusion of the permanency review hearing, and at the request of the foster family, Child was placed with foster parents, C.B. and R.B., who are an adoptive resource. **See** Trial Court Opinion (1053 MDA 2024), 1/13/25, at 6-7.

According to Child's former foster mother, on the evening Child was placed in her home, while putting Child to bed, Child inquired of her, "Do I sleep with [foster father]?" referring to foster father D.F. Child further asked, "No man [] come in here?" She claimed she was afraid of D.F. and stated, "[D.F.] don't put that up my booty." Finally, Child inquired of foster mother, "Are strangers coming into my room?" On January 5, 2023, Child questioned foster mother, "Who sleeps in this bed?" And while expressing fear, Child asked, "Nobody come in here when I sleep?" She further asked, "I don't sleep in no bed or Grace's bed or [D.F.'s] bed?" referencing the foster father and the foster family's natural children. On January 6, 2023, Child stated, "I don't want to see Mommy or Poppy [Father], I scared of them." She further said, "When tears go in my mouth they make me sick, the tears make me throw up, I throw up on the man." Child stated the name "Mario" and once again inquired whether strangers were coming into her bedroom. On January 7, 2023, Child made statements to foster mother that she doesn't "want that man to come in here, he's scary. His name is Joe Joe, he touched my privates." On January 8, 2023, Child stated to foster mother, "Poppy hit my head and my body. Poppy doesn't take care of me. He does bad things to me." During Child's placement with foster parents, she consistently made additional statements about "strangers" touching her, claiming her "booty hurts," and referencing her fear of Father and her paternal grandmother. **See** Pa.R.A.P. 1925(a) Opinion, 4/9/24, at 6 n.4.

- 3 -

On June 4, 2024, the court held a permanency review hearing and a termination of parental rights hearing (TPR). Dan Worley, Esquire, guardian *ad litem*, and Brandy Hoke, Esquire, legal counsel, appeared on behalf of Child. Mother also appeared and was represented by counsel. Following the hearing, the court terminated Mother's parental rights. *See* Order, 6/25/24.

On July 18, 2024, Mother filed a timely notice of appeal concurrently with a concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i). The orphans' court issued an opinion pursuant to Pa.R.A.P. 1925(a). On appeal, Mother asks this Court to determine whether the orphans' court erred or abused its discretion in terminating her rights under 23 Pa.C.S.A. § 2511(a)(2). *See* Appellant's Brief, at 1.

"In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support

- 4 -

an opposite result." ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. ***Interest of S.K.L.R.***, ***supra*** at 1123-24.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." ***C.M.***, ***supra*** at 358. Termination of parental rights has "significant and permanent consequences for both the parent and child." ***L.A.K.***, ***supra*** at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***C.M.***, ***supra*** at 358 (citation omitted).

Subsection 2511(a)(2) of the Adoption Act states that termination may be granted based on the "repeated and continued incapacity, abuse, neglect[,] or refusal of the parent has caused the child to be without essential parental care, control[,] or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect[,] or

refusal cannot or will not be remedied by the parent." 23 Pa.C.S.A. § 2511(a)(2).

At the hearing, the court heard testimony from the following: Amy Barton, Regional Director of Pressley Ridge; Anna Ryabyy, a permanency specialist at The Bair Foundation; Hilary Carter-Mann, school counselor at Hamilton Elementary; Jennifer Hanson, a licensed clinical social worker at Healing Hearts Counseling Center; foster mother, C.B.; Jessica Myers, family therapist; Natacha Martinez, visitation supervisor; Elizabeth Rhoads, Child's caseworker; and Sheena Hay, Agency Family Support Supervisor. Mother and Father also testified.

Agency Family Support Supervisor Hay testified that Mother's permanency plan goals included the following:

> That she would maintain contact and cooperation with the Agency, that she will ensure safe reunification. That included a psychological evaluation with a parenting component, to follow all recommendations of the provider, and to participate in JusticeWorks, JustCare, and the third one was to have meaningful visitation with [Child] when contact is permitted.

N.T. TPR Hearing, *supra* at 110. Hay further testified that Mother "complied" with the permanency plan, but explained:

> **Compliance means the minimum standard for cooperation with the goals.** It's not [suff]icient to ensure the protection of the child. The circumstances that led to placement still remain with the services that were provided. [Child] still lacks a sense of safety and security to mitigate the risk that was at the beginning and remains, and there has additionally been no acknowledgement of the abuse, and it's not conducive for [Child's] well-being. The risk to her remains.

- 6 -

*Id.* at 110-11 (emphasis added). With respect to visitation, Hay testified:

There's always been someone present to supervise the visits. Over the course, they have been with different providers and different venues, and it's been consistent that [Child] has always created an alliance with who[m]ever is providing that supervision or support. She's not been able to secure an attachment with [Mother and Father], and she continues to have pre-imposed symptoms despite not having a direct safety concern in the visit.

*Id.* at 112.

Hay further testified that "[t]he efforts that were put in by each parent ha[ve] not alleviated [Child's] emotional and psychological trauma, and we are not able to ensure her overall safety and well-being." *Id.* at 114. Hay explained:

[Child] has consistently been In a state of trauma throughout the life of the case. On the basis of her physiological needs, eating, clothes, sleeping, obviously there was other testimony regarding her needing to stabilize, having more regulation, and she's going to need some significant services for an extended period of time to work through that regulation, and we would like to have seen an adherence to the goals.

*Id.* at 114-15. *See also id.* at 38, 51 (Healing Hearts social worker Hanson testifying: "It's pretty obvious when [Child] is specifically talking about fear, it is typically when she is talking about [Father], the strangers, and sometimes with [Mother].").

Further, Hay confirmed that this case came in as a concern that Child was being sex trafficked, and that both parents continue to avoid acknowledging the abuse. *Id.* at 140. For instance, when asked whether

- 7 -

Child's recurrent urinary tract infections and bruising on her private area raised concerns about sexual abuse, Mother testified:

> I've always had concerns about it. I think her—her—like she was different. Whenever I got her back from her dad's, she was always different. Like I knew there was something wrong with her, but I just couldn't figure it out.

*Id.* at 175-76. When asked if she thought Child was "making up the statement she said about you and Father," Mother responded, "To a certain extent, yeah. . . . I—I just—she would never tell me like what was wrong when she came back from her dad's." *Id.* at 176. Mother also stated that she believed foster parents and Agency staff were "telling [Child] what to say." *Id.* Despite this statement, Mother acknowledged that "something happened to [Child,]" and that she had concerns about Child before the Agency became involved, but "had no recollection" or "didn't see that when it was happening." *Id.* at 177, 181. Tellingly, Mother's answers reflected no further insight into Child's distress.

During the TPR hearing, the Agency continued to express concerns that, while Mother "checked boxes" as far as her permanency plan goals, the circumstances that led to the original placement continued to exist—both Mother and Father fail to acknowledge and take responsibility for the full extent of the severe abuse to which they subjected Child. Child continued to exhibit significant symptoms related to her trauma, including dissociative

states[5] and sexualized behavior. The Agency opined that Child is not emotionally or physically safe with either parent. The orphans' court agreed.

The circumstances that led to the placement continue to exist. Despite over a year of Agency involvement, Child remains physically, mentally, and emotionally at risk if returned to Mother. Mother has been given a reasonable period of time to remedy the Agency's concerns; however, to date, Mother is unable to admit that Child was sexually abused. Due to Mother's inability to

_____

[5] Evans-Freet explained as follows:

> Disassociation is when something is emotionally too overwhelming for an individual and they actually fracture and leave mentally from where they are going to like another place, another time. Very often in children it looks like they are spacing out or zoning out and they are typically unresponsive to initial verbal prompts to get them to communicate with you.

*In the Interest of: A.M.F., a Minor*, *Appeal of: A.M.-C., Father*; *In the Interest of A.M.F., a Minor, Appeal of K.F., Mother*, 377 MDA 2024, 413 MDA 2024, (Pa. Super. filed Feb. 20, 2024) (unpublished memorandum decision), quoting N.T. TPR Hearing, 9/21/23, at 8.

Evans-Freet detailed another, troubling disclosure that occurred during a therapy session on March 21, 2023, wherein Child stated the following:

> [S]trangers stick things in my butt and show me how to stick things in their butt. [G.W.] and Mommy go with me to strangers' houses. I go into a room and strangers come and knock on my door all day. [Mother] is in a different room. The strangers stick things up [Mother's] butt too. They say not [to] be scared because they will never leave me. [Mother] doesn't like the strangers. She cries.

*Id.*, quoting N.T. Hearing, 9/21/23, at 14.

even recognize or acknowledge the issue that led to placement, the orphans' court's determination that "[r]epeated abuse has caused [] Child to be without essential parental care for her physical and mental well-being and the conditions caused by the abuse cannot be remedied by the Mother" is supported by competent evidence of record. *C.M.*, *supra*. We find no error or abuse of discretion. *L.A.K.*, *supra*.

Additionally, the orphans' court concluded that Child's developmental, physical, and emotional needs and welfare are best served by terminating Mother's parental rights. *See* 23 Pa.C.S.A. § 2511(b). In addition to the fact that Child has not suffered urinary tract infections since removal from parents, the record establishes that Child has thrived in the foster care of C.B. and R.B. C.B. testified that Child refers to her as "mom," refers to C.B.'s husband, foster father, as "dad," and refers to foster mother's mother as "Nana." N.T. TPR Hearing, *supra* at 56, 58. Child is close with C.B.'s sister, refers to her as "aunt," and refers to aunt's children as "cousins." *Id.*

Hay opined it was in Child's best interest to terminate Mother's rights. Although Hay acknowledged Child has an emotional bond with Mother, her testimony indicated that the bond was "unsettled," "unhealthy, "doesn't present as being beneficial to be preserved," and that severing the bond would not cause "irreparable harm to the child, and it will further better her chance to increase her growth and development." *Id.* at 115-16, 136. *See In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014) ("While a parent's emotional bond with his or her child is a major aspect of the [section] 2511(b) best-interest

- 10 -

analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child."); ***id.*** ("In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent."). Unquestionably, a significant bond has been established between the foster parents and Child. Importantly, that bond carries over to other family members in the foster parents' household and to foster mother's relatives. Child turns to the foster parents for emotional support and safety. She is not only safe in her current placement but is thriving considering the trauma she has suffered. ***See In re: K.K.R.-S.***, 958 A.2d 529, 533 (Pa. Super. 2008)(court does not need expert bonding assessment to determine quality or nature of bond between parent and child); ***In re: A.R.MF.***, 837 A.2d 1231 (Pa. Super. 2003) (social workers and caseworkers are qualified to offer assessments as it relates to bond).

Finally, we agree with the Agency's argument:

There is no dispute that this is an unusual case when compared to the vast majority of matters before the Court. This is not a drug and alcohol case which can be assessed through the use of empirical data that demonstrates whether or not a child is safe or unsafe (a parent is testing negative or positive for illicit substances), and it cannot be evaluated based solely on Mother['s] compliance with services. [Child] has been clear and consistent across multiple professionals as to what happened to her while in the care of the parents. Mother and Father have yet to offer any viable explanation for why [Child] would fabricate any of the statements she has made, nor have they addressed why the minor child would have knowledge of sexual content vastly

- 11 -

outside of what a "typical" child of her age would know. Simple compliance with[] and the checking off of [c]ourt[-]ordered goals is not enough to protect this particular child. . . .Simply put, [Child] cannot be physically or mentally safe in the care of either parent.

Brief in Support of Agency's Petition for Involuntary Termination of Parental Rights and Motion for Change of Goal, 6/14/24, at 11-23.

We find no error or abuse of discretion. *L.A.K.*, *supra*. Accordingly,

we affirm the orphans' court's order terminating Mother's parental rights.[6]

Order affirmed.[7]

_____

[6] We note that in her statement of questions presented, Mother also challenges the change of goal. *See* Appellant's Brief, at 1. We point out, however, that Mother has filed a separate appeal from the order changing the goal from reunification to adoption. *See In the Interest of A.M.F.*, *a Minor*, *Appeal of K.F.*, *Mother*, *supra*. On November 12, 2024, and again on December 2, 2024, Mother filed an application to consolidate that appeal with the instant appeal; on December 6, 2024, this Court denied Mother's applications for consolidation. *See* Order, 12/6/24. Briefs in that case are due on February 24, 2025. *See* Order, 1/14/25. We also refer Mother and her counsel to the case of *In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa. Super. 2021) ("[T]he effect of our decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change Child's goal to adoption.") (citation omitted).

[7] Although Mother challenges termination only with respect to section 2511(a)(2), this Court is not willing to overlook the orphans' court's finding under section 2511(a)(10), the juvenile court's determination of abuse under the CPSL, and this Court's affirmance of that determination. *See* 23 Pa.C.S.A. § 6303(b.1)(4); *see also In the Interest of: A.M.F.*, *a Minor, Appeal of: K.F.*, *Mother*, *supra*.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 2/14/2025