**In re JULISSA O., Alexandra O. and Alexis O., Jr., Appellees.**

**Appeal of Virginia R., Mother.**

Superior Court of Pennsylvania.

Submitted Nov. 8, 1999.

Filed Feb. 8, 2000.

David R. Pollak, Reading, for appellant.

Thomas S. Roman, Jr., Reading, for Guardian Ad Litem, participating party.

Alfred W. Crump, Jr., Reading, for Berks County Children & Youth Services, participating party.

Before FORD ELLIOTT and HESTER, JJ., and CIRILLO, President Judge Emeritus.

HESTER, J.:

¶ 1 Virginia R. ("Mother") appeals from the order entered February 2, 1999, terminating her parental rights in her children, Julissa O., born October 23, 1992, Alexandra O., born June 30, 1994, and Alexis O., Jr., born May 12, 1995. We have reviewed the record and considered the arguments of the parties and the applicable law. We affirm.

¶ 2 Mother and Father, who never married, are the biological parents of the above-named children. Father is not involved in this appeal. Berks County Children and Youth Services ("CYS") first became involved with Mother and the children when Alexandra was born prematurely. The social worker at Reading Hospital contacted CYS with concerns about the infant's special needs, the Mother's youth, and domestic violence in the household. N.T., 3/13/98, at 8. The case was opened for protective services. *Id.*

¶ 3 During the next year, Mother moved six times. *Id.* at 9. The trial court summarized the moves and the conditions that accompanied them.

> Mother was residing in a damp, cold basement, with no refrigerator, and only one functioning stove burner. After being evicted from this residence, she moved to the Salvation Army Shelter where she would have access to a telephone, which was needed for Alexandra's apnea monitor. Mother then moved from the Shelter to a friend's home, eventually returning to the basement with no phone or working utilities. On October 3, 1994, Mother moved to a one bedroom apartment which had working utilities but which was filthy, with cockroaches and mice running through the home.

Trial Court Opinion, 1/15/99, at 1–2; *see also* N.T., 3/13/98, at 3–4.

¶ 4 Mother's third child, Alexis was born in May 1995. On July 26, 1995, all three children were declared to be dependent and placed in foster care. Between July 1995 and January 1996, supervised visits with Mother progressed to unsupervised visits. During the period from December 26, 1995, until January 2, 1996, overnight visitation occurred due to a problem in the foster home. When conditions in the household with Mother were found to be threatening to the children, CYS planned to return the children to foster care on January 2, 1996. *Id.* at 15–16. However, on that date, Mother and the children could not be located. CYS later learned that Mother had gone with the children to Puerto Rico. *Id.* at 128. They eventually

were located in June 1996, and the children were returned to foster care. *Id.* at 16–17.

¶ 5 In August 1996, Dr. Michelle Munson conducted a psychological evaluation of Mother, and the children underwent developmental evaluations in June 1996. By the review hearing in July 1997, the goal changed from reunification to termination of parental rights and adoption. CYS filed petitions to terminate parental rights on October 30, 1997. Following a hearing on March 13, 1998, the orphans' court filed a decree *nisi* terminating Mother's parental rights. Mother filed exceptions, which were denied on January 15, 1999. This appeal followed entry of the final decree on February 2, 1999.

· ▪ ¶ 6 Mother contends the orphans' court erred in concluding that CYS established by clear and convincing evidence grounds for terminating her parental rights. The orphans' court found that CYS had established that Mother's parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (5). Those sections provide:

**§ 2511. Grounds for involuntary termination**

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

▪ ¶ 7 The standard of review in cases involving the termination of parental rights is limited to the determination of whether the orphans' court's decree is supported by competent evidence. *In re: Adoption of Atencio,* 539 Pa. 161, 650 A.2d 1064 (1994); *Adoption of M.S.,* 445 Pa.Super. 177, 664 A.2d 1370 (1995). Where the hearing court's findings are supported by competent evidence, an appellate court must affirm the hearing court even though the record could support the opposite result. *Atencio, supra.* In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Adoption of Atencio,* [*supra*] at 1066. It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination. *In re Bowman,* 542

Pa. 268, 666 A.2d 274 (1995) (Zappala, J., Opinion in support of Reversal); *In re K.C.W.*, 456 Pa.Super. 1, 689 A.2d 294 (1997); *Adoption of Dale A.*, 453 Pa.Super. 106, 683 A.2d 297 (1996); *Adoption of Hamilton*, 379 Pa.Super. 274, 549 A.2d 1291 (1988). *In the Matter of the Adoption of Charles E.D.M.*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998).

¶ 8 Mother contends that she visited with her children constantly, cooperated with CYS in taking advantage of services offered, was able to remedy the conditions and causes of neglect, and the services that were provided, were provided unreasonably. However, the record reveals a different picture; one that supports the orphans' court conclusions. Not only did Mother move from place to place, but the living conditions to which she subjected these young children were deplorable. Garbage and dirty dishes were in piles, roaches and rats were present, and the floors were covered with dried food. N.T., 3/13/98, at 9. The medical needs of the children were ignored. *Id.* at 11.

¶ 9 Various services were offered to Mother. Berks Visiting Nurses came into the home, as did a Spanish-speaking parenting instructor from the Lutheran Home. *Id.* at 10–11. In-home instruction on living and parenting skills was offered several times per week from TEHST, Inc. *Id.* at 13–16. Counseling and parenting instruction were offered by Open Door and Alpha Counseling and Mediation Center, Inc. *Id.* at 18–19. Instructors from Alpha Counseling spoke both English and Spanish. *Id.* at 45. Records from TEHST confirmed that in June 1995, Mother missed eighteen sessions and in May of that year, she missed ten sessions. *Id.* at 54.

¶ 10 Dr. Ivan Torres of Alpha Counseling and Mediation Center testified that services were begun in October 1996. *Id.* at 59. Family therapy centered on suggestions for the application of parenting skills taught to Mother as well as assess-ments of attachment and bonding between Mother and the children. *Id.* at 60. Dr. Torres testified that Mother was unable to identify age-appropriate expectations for the children, the children had varying degrees of emotional difficulty connecting with Mother, and Mother lacked the necessary insight to follow-up on safety issues. *Id.* at 61.

¶ 11 Dr. Torres testified that the children "would be significantly at risk" if they were returned to Mother's care. He opined that the fact that Mother was again pregnant with her fourth child at the time of the hearing posed additional concerns for her ability to manage the children and "significantly impair[ed] any reunification efforts." *Id.* at 68.

¶ 12 Dr. Michelle L. Munson also testified as an expert. She performed a psychological parenting and bondedness evaluation of Mother in August 1996. She found Mother "to be both dependent and masochistic, to function at a borderline intellectual level, and to be overwhelmed by the necessity of taking care of herself, much less the needs of the children." *Id.* at 91–92. The following testimony was significant:

Q  Now, addressing Alexandra and Alexis together, do you foresee any detriment to them psychologically if mother's parental rights would be terminated?

A  There was not a bond that I could see that would have been detrimentally broken by terminating the rights.

Q  Now, with regard to Julissa, what would—do you have an opinion as to what would be in her best interests?

A  I think it will be harder for her to separate from her mother but I don't think her mother—it's exceedingly unfortunate that [Mother] had the same kind of upbringing that these children thus far have experienced. [Mother] describes a childhood in which she literally was a nonentity in her family and as a result, she grew up virtually empty of an

understanding of nurturing and affection and attention.

Julissa is going to end up in the same situation if she is not in a family where there is the ability to nurture her, to guide her, to offer her a great deal of connectedness, to provide stimulation. I don't think [Mother] is capable of that and I think it's not from a lack of caring for the children. I think she just never got it herself. So it's nonexistent.

Q   Do you see any services or treatment available that would remedy that condition in [Mother] that she would be able to effectively parent these children within a reasonable period of time?

A   Not within a reasonable period of time. We are really talking about characterological deficits that even if they can be changed somewhat, we are talking years and years and years and these kids don't have that. When I saw them, they were already looking pretty attachment disordered.

Q   And would it be your opinion that it's speculative to suggest whether [Mother] could ever make those changes?

A   Highly speculative. If she had had anything in her background that had provided her nurturance and sustenance and caring, there would be some building blocks upon which perhaps some personal growth could occur. She didn't get that as a kid.

Q   And do you have an opinion as to whether she could do it, say just with Julissa if her rights would be relinquished as to Alexis and Alexandra?

A   I think that that would be making Julissa a guinea pig and I don't think that's fair to any child.

N.T., 3/13/98, at 95–96.

¶ 13 We find no support for Mother's arguments that there exists no evidence that the conditions or causes of the incapacity could not or would not be remedied. In fact, the record supports the opposite conclusion. Likewise, there is no record support for Mother's claim that the myriad of services that were provided were provided unreasonably. Parenting instructors spoke both Spanish and English. At one point, three different agencies were providing direct parenting support. *Id.* at 36. Mother posits, in response to an admission that she had difficulty parenting her children, that the services provided failed to rectify the situation, *viz*, that the services were somehow flawed. The law is clear. Mother had an affirmative duty to work toward the children's return. *In re: Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883 (1986). That duty exists when children are placed in foster care. *In re: William L.*, 477 Pa. 322, 383 A.2d 1228 (1978). As the Pennsylvania Supreme Court stated in *Adoption of J.J., supra*, 511 Pa. at 602, 515 A.2d at 890, "[T]his 'affirmative duty,' at minimum, requires a showing by the parent of a willingness to cooperate with the agency to obtain the rehabilitative services necessary for the performance of parental duties and responsibilities." *In re: Diaz*, 447 Pa.Super. 327, 336–38, 669 A.2d 372, 377 (1995).

¶ 14 Mother makes a nebulous argument regarding the fact that she baby-sat for a friend's four-year-old child during this period and had no trouble implementing the skills she had learned. It is unclear just what inference Mother seeks from the referenced fact. She merely asserts "that when she was repeatedly observed in a situation with only one child, albeit not one of her own, she was able to manage without problems." Mother's brief at 13.

¶ 15 We reviewed the testimony in question. Dr. Torres testified that from his observation of Mother with her friend's child, he concluded "her interaction ... seemed appropriate." N.T., 3/13/98, at 75. Dr. Torres also noted that the child "did not appear to have any special needs" and "she posed no challenge." *Id.* at 75–77. He went on to report that the babysitting situation "was different from [Mother's] own children who, in fact, you know, did test and those children have special needs

and generically and temperamentally [sic] this other child was a pretty easy child." *Id.* at 76.

¶ 16 From this testimony, Mother apparently suggests that if she had seen her own children individually, she might have been able to demonstrate parenting skills. This suggestion is absurd. We can draw no positive conclusion from a claim that a parent cannot handle all of her children but might be able to parent one of them. This contention is especially unpersuasive in light of Mother's fourth pregnancy at the time of the hearing. Moreover, even if Mother had provided evidence that she properly cared for another of her *own* children, it would not negate the evidence of her inability to parent these children. We rejected such a claim in *In re Adoption of M.A.R.*, 405 Pa.Super. 131, 591 A.2d 1133, 1136 (1991), where we stated that the existence of another "child, who may or may not be well taken care of, is irrelevant to the instant case."

¶ 17 This record reveals that Mother has made no progress in rectifying the conditions that led to the removal of the children. We conclude that CYS, by clear and convincing evidence, proved that the conditions that led to the removal of the children continue to exist, Mother will not or cannot remedy them within a reasonable time, and termination of Mother's parental rights would serve the needs and welfare of the children. Moreover, CYS has provided Mother with opportunities to remedy the situation to no avail. "A parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties." *In re: E.M.*, 533 Pa. 115, 120–22, 620 A.2d 481, 484 (1993) (quoting *In re: William L., supra,* 477 Pa. at 345, 383 A.2d at 1239). Thus, the evidence presented was sufficient to satisfy the criteria of 23 Pa.C.S. § 2511(a).

¶ 18 Order affirmed.