J-S28032-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.J.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1012 EDA 2021 |

Appeal from the Decree Entered April 29, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000207-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: C.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1013 EDA 2021 |

Appeal from the Order Entered April 29, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000810-2019

BEFORE:  BOWES, J., DUBOW, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:          **FILED OCTOBER 4, 2021**

M.K. (Mother) appeals from the decree and order[1] entered in the Court

of Common Pleas of Philadelphia County (trial court) involuntarily terminating

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] We have consolidated Mother's appeals from the decree and order *sua sponte*.

her parental rights to her daughter, C.F. a/k/a C.J.F. (Child) (D.O.B. 11/2017) and changing Child's permanency goal to adoption.[2]  We affirm.

**I.**

**A.**

Child's family first came to the attention of the City of Philadelphia Department of Human Services (DHS) in July 2018 when DHS received a General Protective Services (GPS) report concerning Child's eleven-year-old brother, D.K., who had been brought to St. Christopher's Children's Hospital due to his suicidal and homicidal ideations.  In May 2019, DHS learned of the inappropriate sexual contact of Child's older sibling, M.F., with a high school student.  On May 10, 2019, DHS met with Parents and M.F. at the family's home when Father became belligerent, using profanity and attempting to evict DHS from the home.  DHS observed that he had a lot of control over Mother and the children.

On May 14, 2019, after it had conducted an unannounced home visit, smelled cannabis and was unable to complete Parents' interview or ascertain Child's safety (who was one-and-a-half years-old at the time of the visit) because of Parents' refusal to cooperate, DHS obtained an order of protective custody (OPC).  DHS removed Child from the home with police assistance and

---

[2] The parental rights of Child's birth father, C.F. (Father), were also terminated on April 29, 2021, and he has not appealed that decision.  We refer to Mother and Father collectively as "Parents."

placed her in the care of her maternal grandparents (Maternal Grandparents) where she has continuously remained with her siblings.

On May 16, 2019, a shelter care hearing was held at which the trial court lifted the OPC and ordered Child's temporary commitment to DHS to remain. Mother was present at the hearing. It further ordered that Mother and Father were to have separate supervised visits at the Community Umbrella Agency (CUA).

On June 21, 2019, the trial court held an adjudicatory hearing at which Mother was present, adjudicated the Child dependent, lifted the temporary commitment and fully committed her to DHS. Parents' visits were to continue to be supervised and separate at the CUA. The court also ordered that Mother sign all releases and consents; DHS/CUA refer Mother to the Achieving Reunification Center (ARC) for parenting, domestic violence, employment, healthy relationships and job training classes; Mother be referred to Behavioral Health Systems (BHS) for consultation and/or evaluation; and Mother's Single Case Plan (SCP) for her older children be implemented. (Order of Adjudication and Disposition, 6/21/19).

The court held several permanency review hearings. Mother's compliance with the permanency plan was found to be moderate on September 18, 2019, substantial on December 13, 2019, and moderate again on March 5, 2020. On September 11, 2020, the court found that Mother had made minimal progress in alleviating the conditions that led to Child's

placement. DHS was found to have made reasonable efforts for reunification at all permanency review hearings. (*See* Permanency Review Orders, 9/18/19, 12/13/19, 3/05/20, 9/11/20, 1/22/21). At the September 11, 2020 hearing, the court listed the contested goal change hearing for March 8, 2021.

Mother attended the March 8, 2021 hearing. She was present when it was continued until April 29, 2021, at the request of DHS, which was awaiting Child's birth certificate. (Status Review Order, 3/08/21).

**B.**

On April 14, 2021, DHS filed petitions for involuntary termination of Mother's parental rights and change of Child's permanency goal to adoption. (*See* Petition for Involuntary Termination of Parental Rights, 4/14/21; Petition for Goal Change to Adoption, 4/14/21).

On April 29, 2021, the trial court held the contested goal change/termination hearing for Child.[3] Olivia Robinson, the CUA case manager for the family; Victoria Richardson, the CUA case aid for the family, as well as Maternal Grandmother appeared. Ms. Robinson testified on behalf of DHS. Mother did not attend or submit any evidence. Ms. Robinson stated that she had last spoken with Mother on April 16, 2021, and had advised her of the hearing. She also reminded her about the hearing by email, text and

_____

[3] The proceeding also involved a permanency review hearing for M.K. and D.K. and Ms. Robinson testified on behalf of the CUA regarding these minors. Some of her testimony was relevant to Mother's behavior with all three children.

telephone between Monday, April 26, 2021, and the hearing on Thursday, April 27, 2021. (**See** N.T. Hearing, 4/29/21, at 23-24).

Mother's counsel objected to the timing of the service of notice of the hearing. She argued that even though it was filed and sent via UPS overnight on April 14, 2021, service was not achieved until April 15, 2021, making service untimely by one day.[4] (**See id.** at 32-34). The court noted the objection and the hearing proceeded.

**1.**

Ms. Robinson testified that she was assigned to this case since the OPC was obtained on May 14, 2019. (**Id.** at 35). Child came into care due to behavioral health concerns, sexual acting out by Child's older sister, M.F., conduct by the Parents and household members, concerns about domestic violence in the home based on Father's behavior and Parents' previous refusal to give DHS access to the home. Mother had not been consistently compliant with her SCP objectives for reunification with Child or her siblings, which had been the same throughout the life of the case: (1) sign releases and consents; (2) participate in supervised visits as ordered by the trial court; (3) engage in a BHS evaluation and consultation; (4) participate at ARC for healthy

---

[4] Pursuant to Rule 1124 of the Juvenile Act, interested parties must receive notice of a change of goal proceeding 15 days before the scheduled hearing. **See** Pa.R.J.C.P. 1124(B). The Adoption Act provides that DHS must provide at least ten days' notice of an involuntary termination of parental rights hearing. **See** 23 Pa.C.S. § 2313(b).

relationships, employment and parenting; (5) family therapy when appropriate; and (6) allow CUA to complete bi-weekly home assessments. (*See id.* at 35-36).

Mother did not communicate regularly with her and when she did, she was often aggressive and belligerent, communicating through "rude and nasty" telephone calls and text messages. For example, she directed racial epithets at Ms. Robinson and threatened to have her arrested and shot if she conducted pop-up visits at the home. Despite this resistance, Ms. Robinson consistently attempted to engage Mother in her objectives. Mother had Ms. Robinson's contact information throughout the life of the case. (*See id.* at 36-37, 58).

Ms. Robinson explained that Mother had been minimally compliant with her SCP objectives for reunification with Child. For example, Mother failed to enter the ARC Healthy Relationships program to address domestic violence issues that had brought the Child into care, despite being referred to ARC after the adjudicatory hearing and after every permanency review hearing thereafter. Instead, she continued to deny that she was or had been in a domestically violent relationship with Father. Although Mother claimed that ARC never called her to arrange for an intake into the program, Ms. Robinson testified that ARC did reach Mother to arrange for her to enroll in a parenting class and informed her that she could contact ARC directly and enroll in the program, but she failed to do so. DHS believed that Mother's successful

engagement and completion of the domestic violence program was essential for there to be a safe reunification with Child due to ongoing concerns that Mother was still living with Father. Although Mother claimed that Father had moved out of the family home in September 2019, he recently had texted Ms. Robinson from Mother's phone, stating that he had been living in the home the entire time. Ms. Robinson also believed he still resided in the home because she had seen a man's shoes, clothing and other personal effects when she visited the home after Father purportedly had moved out. When Ms. Robinson asked Mother when Father had moved out of the home, she said she did not know. (**See id.** at 17, 43, 47-48, 59-60).

Mother refused to allow CUA to conduct consistent bi-weekly home assessments required by her SCP, which heightened Ms. Robinson's concern that Father still resided there. Mother did not explain why she refused to permit the assessments, instead simply failing to respond to Ms. Robinson's requests to schedule them. The virtual home visits Ms. Robinson conducted during the implementation of COVID restrictions did not allow her to determine who was residing in the home because they were scheduled in advance and their online nature did not permit her to fully see who was residing there. These limitations, combined with Mother's refusal to permit in-person assessments, raised Ms. Robinson's concerns about whether Child would be safe in the home. (**See id.** at 45, 47, 61).

Mother was ordered to report for random drug screens and she did report for some of them and those came back negative. However, Mother had failed to appear for the screens for the last year prior to the termination/change of goal hearing, attributing the failure to her work schedule. (*See id.* at 45, 71-72).

Ms. Robinson had concerns about Mother's mental health and stability because of her erratic behavior in "cussing [her] out," not allowing the CUA into the home, threatening to have her arrested and threats to take Child from Maternal Grandparents' house. She failed to provide CUA with legible copies of her paystub and work schedule, a signed lease indicating she had appropriate housing, and documentation from her physician that she had been prescribed medical marijuana and that she had a condition requiring it. Although Mother signed the necessary consents for the medical documents, when Ms. Robinson contacted Mother's doctor, she was told that Mother was no longer a patient and, therefore, no records could be provided. (*See id.* at 16, 22-23, 37, 42, 44-45, 63).

As to Child's relationship with Mother, Mother's initial supervised visitation at the CUA progressed to once monthly visits in the community, with CUA supervision. However, the new arrangement lasted approximately one month until Mother failed to cooperate and declined to attend in-person visitation due to the COVID pandemic. She recommended visits when virtual visitation was implemented from April 2020 to September 2020, but she did

so inconsistently. Maternal Grandmother was available to supervise virtual visits, and although they would occur whenever Mother requested them, she did not do so on a regular and consistent basis. When in-person visits were reinstated in September 2020, Mother elected to continue virtual visits, citing COVID concerns, and she started to visit more consistently. Mother agreed to resume in-person visitation in March 2021 and attended one in-person supervised visit at the agency on March 29, 2021, but then, without explanation, she missed the next four consecutive visits that immediately preceded the goal change/termination hearing. (*See id.* at 37-41, 70-71).

Ms. Robinson described the visits between Child and Mother as familial but not parental, meaning that, although Child appeared to enjoy her visits with Mother, her parental bond was more with her Maternal Grandparents. At the time of the hearing, Child was three-and-one-half years old and had been in her Maternal Grandparents' care for approximately two years. While living with them, Child developed and maintains close relationships with extended family and her siblings, who also resided in the home. Ms. Robinson did not believe that Child would suffer irreparable harm if Mother's parental rights were terminated because she is very young and had been with Maternal Grandparents since she was placed in DHS care approximately two years prior. Maternal Grandparents were willing to adopt Child and maintain a consistent relationship between Child and Mother. Child looks to Maternal Grandparents for all of her needs, is doing well in the home and is developing on target for

her age. Ms. Robinson believed it would be in Child's best interest to terminate Mother's parental rights to free Child to be adopted since Mother has been non-compliant with her objectives for reunification. (***See id.*** at 38, 48-49, 56-58, 65, 75).

**2.**

At the close of testimony, counsel made oral argument[5] after which the trial court found that DHS met its burden by clear and convincing evidence. Specifically, it found that although Mother achieved some level of compliance with her SCP objectives, there were many areas where she failed to comply. For example, her visits were inconsistent, she failed to complete the Healthy Relationships program as ordered and she refused bi-weekly home evaluations. Observing that consideration of petitions for termination of parental rights requires balancing the parent's right to her children and the children's best interest, the court found that Mother and Child do not have a parental bond and Child would not suffer irreparable harm if parental rights were terminated. In considering whether termination was in Child's best interest, the court noted that Child had been with her Maternal Grandparents since she was one-and-a-half years old in May 2019 and that she also was placed with her siblings. Maternal Grandparents met all of her "developmental, physical, and emotional needs, and are providing her with

_____

[5] Mother's counsel did not argue about any service issue.

what's necessary for a healthy childhood." (*See id.* at 96). The trial court explained that "Children do need permanency and can't wait indefinitely for parents to follow through with their reunification objectives." (*Id.*); (*see id.* at 94-96).

Based on the foregoing, the trial court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. §§ 2522(a)(1), (2), (5), (8) and (b) and changed Child's goal to adoption. Mother filed timely notices of appeal to the court's decree[6] and order. Both Mother and the trial court have complied with Rule 1925. *See* Pa.R.A.P. 1925.[7]

On appeal, Mother maintains that the trial court abused its discretion in terminating her parental rights because there was not clear and convincing evidence that she fell within 23 Pa.C.S. §§ 2522(a)(1), (2), (5), (8) and (b).

---

[6] Despite filing a notice of appeal as to the court's April 29, 2021 order changing Child's goal from reunification to adoption, Mother neither raises an issue challenging the change of goal nor makes any argument about it. Therefore, any issue regarding change of goal is waived for our review.

[7] Mother complains that the trial court's Rule 1925(a) opinion is impermissibly vague and requires that we remand this matter for preparation of a new opinion. (*See* Mother's Brief, at 19-20). However, the trial court's Rule 1925(a) submission advises this Court that we can locate the reasons for its decision at pages 94-97. (*See* Trial Court's Notice of Compliance with Pa.R.A.P. 1925(a), 6/08/21). This complies with Rule 1925(a), and Mother's argument to the contrary lacks merit. *See* Pa.R.A.P. 1925(a) ("[I]f the reasons for the order [being appealed] do not already appear of record, [the authoring judge] shall file of record at least a brief opinion of the reasons for the order … or shall specify in writing the place in the record where such reasons may be found.").

(Mother's Brief, at 3-4). The crux of her argument is that she has cooperated with DHS and the CUA, was complying with the objectives of her SCP, there was no proof of domestic violence, and she did not intend to relinquish her rights to Child. (*See id.* at 8). She also claims that DHS did not provide proper notice of the hearing because it was sent to the wrong address and that trial counsel was ineffective for not arguing this claim. (*See id.*).

## II.

## A.

We address Mother's notice claim first. Mother cites to Rule 1124(B) of the Pennsylvania Juvenile Act[8] in support of her claim that service of the goal change and termination petitions was not proper because DHS sent the petitions via overnight UPS, who left it at the front door of 6760 Hegerman Street, Philadelphia, which was not the address provided in the February 11, 2021 Parent Locator Search (PLS). She contends that the address identified by the February 11, 2021 PLS is 6648 Vandike Street, Philadelphia, which is

---

[8] Pursuant to the Juvenile Act, the court or its designee must give written notice of a goal change and permanency hearing to all parties, including the juvenile's parents, either "in person[] or by certified mail, return receipt and first-class mail" 15 days prior to the scheduled hearing. Pa.R.J.C.P. 1124(B), 1601(B), *Comment*; *see also* Pa.R.J.C.P. 1124(A). However, as we state in notes 6 and 13, Mother waived any issue regarding change of goal under the Juvenile Act and argues only about the termination of her parental rights, which is guided by the Adoption Act. *See* 23 Pa.C.S. § 2313(b).

- 12 -

where trial and appellate counsel and the CUA had contacted her.[9] (**See** Mother's Brief, at 19). Mother claims she did not know about the April 29, 2021 hearing because she did not receive the petitions, and that service was improper because it was not personal service by certified mail, return receipt requested, thus violating her constitutional rights. (**See id.**).

As noted by Child's counsel, this issue is waived. First, although trial counsel raised the issue of service at the hearing, she objected to the timing of service, not its location or method. (**See** N.T. Hearing, 32-34); **see also** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived for our review."). As Child's legal advocate notes, Mother does not allege that she does not reside at 6760 Hegerman Street, only that the February 11, 2021 PLS reflected a different address. If that issue had been raised, evidence could have been adduced as to where she lived, and any constitutional challenges regarding lack of notice could have been addressed squarely by the trial court.[10] Additionally, Mother provides no legal citation or discussion thereof

---

[9] As Child's legal advocate notes, Mother does not allege that she does not reside at 6760 Hegerman Street, only that the February 11, 2021 PLS reflected a different address.

[10] We note that DHS has appended an April 8, 2021 PLS conducted three weeks before the hearing that reflects Mother's address as the Hegerman Street address to which the petitions were then served. (**See** DHS's Brief, at Appendix A). Although we mention this for the sake of providing a full history, it is well-settled that this Court may not consider documents that are not part of the certified record and are only included in a party's brief. **See** *(Footnote Continued Next Page)*

to support her claim that a violation of Rule 1124(b) violates her constitutional rights. (Mother's Brief, at 19); *see Commonwealth v. Sherwood*, 982 A.2d 483, 496 (Pa. Super. 2009) (failure to develop argument with adequate discussion and supporting legal citation waives claim); Pa.R.A.P. 2119(a)-(c).

Moreover, to the extent that she argues that counsel's failure to object to the method or location of service was ineffective assistance, no relief is due.

> Where ineffective assistance of counsel claim is made in a termination of parental rights proceeding, this Court must determine:
>
> whether on the whole, the parties received a fair hearing, the proof supports the decree by the standard of clear and convincing evidence, and upon review of counsel's alleged ineffectiveness, any failure of his stewardship was the cause of a decree of termination. Mere assertion of ineffectiveness of counsel is not the basis of a remand or rehearing, and despite a finding of ineffectiveness on one or more aspects of the case, if the result would unlikely have been different despite a more perfect stewardship, the decree must stand.

*In re Adoption of T.M.F.*, 573 A.2d 1035, 1044 (Pa. Super. 1990).

Our review of Mother's brief confirms the argument of both DHS and Child's counsel that Mother fails to provide any discussion or argument on the ineffectiveness claim other than to mention that trial counsel argued that she was not served in a timely manner, not that she was not served at all. (*See* Mother's Brief, at 8, 19). The ineffectiveness issue is waived on this basis and

---

*Commonwealth v. Preston*, 904 A.2d 1, 6-7 (Pa. Super. 2006), *appeal denied*, 916 A.2d 632 (Pa. 2007).

Mother is due no relief. **See T.M.F.**, **supra** at 1044; **see also Commonwealth v. B.D.G.**, 959 A.2d 362, 371–72 (Pa. Super. 2008) ("When an appellant fails to develop his issue in an argument and fails to cite any legal authority, the issue is waived.").

Moreover, we do not find the notice argument persuasive. Mother was present at the January 22, 2021 permanency review hearing. (**See** Permanency Review Order, 1/22/21, at 1). As a result of that hearing, a March 8, 2021 permanency review/contested goal change hearing was scheduled and both Mother and her counsel were served with the order. (**See id.** at 2). Mother attended the March 8, 2021 hearing when it was continued at the request of DHS to enable it to obtain Child's birth certificate. (**See** Status Review Order, 3/08/21, at 1). The March 8, 2021 Status Review Order scheduled a permanency review hearing for April 29, 2021. (**See id.**). In addition, Ms. Robinson met with Mother on April 16, 2021, after the petitions had been filed, and then emailed, texted and left messages by telephone about the hearing in the days immediately preceding it. (**See** N.T. Hearing, at 23-24). Ms. Robinson testified that this was how she had always contacted Mother in the past. (**See id.** at 24).

Based on the foregoing, DHS notified Mother of the hearing and any allegation that her constitutional rights were violated because she was not provided notice or that counsel was ineffective for not raising this challenge would lack merit, even if not waived.

**B.**

Mother argues that the trial court erred in involuntarily terminating her parental rights.[11]   Section 2511 of the Adoption Act governs involuntary termination of parental rights.  ***See*** 23 Pa.C.S. § 2511.  It requires a bifurcated analysis.

> ... Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b):  determination of the needs and welfare of the child under the standard of best interests of the child.  One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

The trial court found that DHS met its burden of proof under 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), as well as (b).  The certified record supports the decree pursuant to Section 2511(a)(1) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

---

[11] "The standard of review in cases involving the termination of parental rights is limited to the determination of whether the orphans' court's decree is supported by competent evidence."  ***In re Julissa O.***, 746 A.2d 1137, 1139 (Pa. Super. 2000) (citations omitted).  "Where the hearing court's findings are supported by competent evidence, an appellate court must affirm the hearing court even though the record could support the opposite result."  ***Id.*** (citation omitted).

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*\*\*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b); *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (stating that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).

"Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." *In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (citation omitted). "Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances."

*Id.* (citation omitted). "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.* (citation omitted). A parent has "an affirmative duty to work toward the children's return[,]" [which,] "at minimum, requires a showing by the parent of a willingness to cooperate with the agency to obtain the rehabilitative services necessary for the performance of parental duties and responsibilities." *In re Julissa O.*, *supra* at 1141 (citations omitted).

**1.**

Mother argues that she has cooperated with DHS and the CUA throughout the case, has visited with Child, has complied with her SCP objectives and did not intend to relinquish her claim to Child. She also contends that DHS has failed to prove domestic violence by clear and convincing evidence.

The trial court observed that:

Termination of parental rights decisions are not made hastily nor taken lightly. The [c]ourt has to balance … the right of a parent to their children but also what's in the best interest of children. In all of these cases when children are placed parents are given [SCP] objectives with the hope that they comply and are able to have full compliance as well as make progress.

It's the [c]ourt's finding in this case that [] Mother … [has not] done that. While Mother has had some compliance with her [SCP] … objectives and has visited, the testimony also reflects that the visits go well but are inconsistent. And for some reason [in] the past few weeks she has failed to do so.

> The testimony is that the visits went well but were inconsistent. September of 2020 supervised … at the [CUA] and were virtual until March of 2021. She visited March 29th … and then for some reason missed the next four. Unfortunately, she failed to complete [H]ealthy [R]elationships as was court ordered. And she refused to do the bi-weekly home evaluation. … [She] failed to comply with the SCP objectives and has failed to make progress … to alleviate the need for placement.

(N.T. Hearing, at 94-96).

The record supports the trial court's findings. It is undisputed that Child was removed from the home because of behavioral health issues due, in large part, to concerns about domestic abuse, and that she has spent most of her young life in the care of her Maternal Grandparents. Ms. Robinson testified that Mother failed to consistently comply with her SCP objectives for reunification with Child. For instance, although Ms. Robinson testified that Mother has engaged in some court-ordered supervised visitation, her compliance has been inconsistent over the life of the case, including most recently missing the four visits immediately preceding the hearing.

Mother refused to attend the ARC Healthy Relationships program to address concerns about domestic abuse in the home, which DHS believed was essential for there to be a safe reunification with Child.[12] Instead, Mother

---

[12] Mother claims that any issue of domestic abuse only involved Father and Child's older sibling. (*See* Mother's Brief, at 16). However, this admits there were abuse concerns in the home. Additionally, the issue before the court was whether Mother complied with all SCP objectives, including that she attend Healthy Relationships, which the evidence established she did not.

denied there was any domestic abuse and claimed Father had moved out. However, Mother was not sure when he vacated the premises, Father called Ms. Robinson from Mother's phone to advise he had never moved out, and on the rare instances Mother had allowed home assessments, Ms. Robinson saw men's clothing, shoes and personal effects. The fact that Mother only sporadically allowed CUA to complete home assessments, despite being court-ordered to permit them to visit bi-weekly, further heightened DHS's concern that Father was still in the home, thus putting Child in danger.

This is clear and convincing evidence that Mother has evidenced a settled purpose of relinquishing her parental claim to Child by refusing to meet her objectives, cooperate with the CUA and ARC, and utilize all available resources to preserve the parental relationship and perform her parental duties. *See In re Julissa O.*, *supra* at 1141. The trial court did not abuse its discretion in finding that DHS presented sufficiently clear and convincing evidence to support termination pursuant to Section 2511(a)(1). *See id.*

**C.**

Having determined that the court properly found that termination of Mother's parental rights was appropriate under subsection 2511(a)(1), we now consider whether termination is in the Child's best interest pursuant to subsection 2511(b).

> With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. In particular, we review whether termination of parental rights would best serve the developmental, physical, and emotional needs and

welfare of the child.  It is well settled that intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child.

One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, with close attention paid to the effect on the child of permanently severing any such bond.  The fact that a child has a bond with a parent does not preclude the termination of parental rights.  Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship.  Notably, where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists.

It is sufficient for the trial court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child.  The trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*Int. of K.M.W.*, 238 A.3d 465, 475 (Pa. Super. 2020) (case citations and most quotation marks omitted).

Mother argues that she and Child "have not been given the opportunity to bond, with increased periods of visitation and more unsupervised visits, than overnight visits."  (Mother's Brief, at 18).

However, the trial court found that:

The testimony reflects that while Mother and [C]hid have a bond, there is no parental bond.  And that [] irreparable harm would [not] be suffered by [Child] if [Mother's] parental rights were terminated.

Alternatively, Child has been with [Maternal Grandparents] since May of 2019.  She is also placed with her siblings and other extended relatives.  …  The testimony reflects that [] Maternal Grandparents provide for her needs.

And they attend to her developmental, physical, and emotional needs, and are providing her with what's necessary for a healthy childhood. It's this [c]ourt's finding that these needs are being met by the grandparents and not by [Mother]. And that it would be in her best interest that the parental rights of Mother[] … be terminated[.]

(N.T. Hearing, at 95).

The evidence supports the trial court's conclusion that terminating Mother's parental rights is in Child's best interests. Ms. Robinson described the inconsistent supervised visits between Child and Mother as familial but not parental. Child was three-and-a-half years of age at the time of the hearing and had resided with Maternal Grandparents for two of those years. Ms. Robinson testified that Child looked to them for all her needs, is doing well in the home and developing on target for her age. She explained that she did not believe Child would suffer irreparable harm if Mother's parental rights were terminated because she is very young and had been with Maternal Grandparents most of her life. She also believed it would be in Child's best interest to terminate parental rights to allow her to be adopted by Maternal Grandparents, who are willing to adopt her and maintain a consistent relationship between Child and Mother.

Accordingly, the record supports the trial court's finding that DHS established that the termination of Mother's parental rights would best serve the Child's interests, and we find no abuse of discretion in its decision to

terminate Mother's parental rights to Child and to change her goal to adoption.[13]

Decree and Order affirmed.

Judge Bowes joins the memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/4/2021

---

[13] As we previously noted, despite filing a notice of appeal as to the court's April 29, 2021 order changing Child's goal from reunification to adoption, Mother raises no issue challenging the change of goal and makes no argument about it. Therefore, any specific challenge to the April 29, 2021 change of goal order is waived.