J-A28013-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ADOPTION OF: J.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.L., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 870 MDA 2021 |

Appeal from the Decree Entered June 24, 2021
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 014-ADOPT-2021

BEFORE: LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.: **FILED: DECEMBER 9, 2021**

J.L. (Father) appeals from the decree, entered in the Court of Common Pleas of Cumberland County, Orphans' Court Division, terminating his parental rights to his minor child, J.L., (Child), born in February 2016. Counsel has filed an **Anders**[1] brief and accompanying petition to withdraw on appeal. After careful review, we affirm and grant counsel's petition to withdraw.

---

[*] Former Justice specially assigned to the Superior Court.

[1] **Anders v. California**, 386 U.S. 738 (1967). **See In re V.E.**, 611 A.2d 1267 (Pa. Super. 1992) (extending **Anders** principle to appeals involving termination of parental rights and requiring counsel seeking to withdraw in such an appeal to do so only after conscientious and thorough review of record, petitioning court for leave to withdraw, and submitting **Anders** brief).

Cumberland County Children and Youth Services (CYS) became involved in this case on October 28, 2019, when Child's biological mother[2] (Mother) was arrested in York County on drug paraphernalia charges.  N.T. Termination Hearing, 5/18/21, at 27.  At the time of Mother's arrest, she and Child were living in a van.  *Id.*  Moreover, Father was incarcerated in York County Prison after assaulting Mother, and his release date was scheduled for the following month.  *Id.*  On January 27, 2020, Child was adjudicated dependent and placed in foster care, where Child has since remained.  *Id.*

CYS developed a Family Service Plan (FSP) for Father, with the goal of reunification.  The specific objectives of the FSP included, *inter alia*:  improve Father's parenting; address Father's substance use and maintain sobriety; attend Child's medical[3] and school appointments; obtain and maintain stable

---

[2] Mother voluntarily terminated her parental rights at the beginning of the same hearing wherein the court involuntarily terminated Father's parental rights.  N.T. Termination Hearing, 5/18/21, at 11-17.

[3] Child has special needs and, at the time of the hearing, was in the process of receiving a multi-step diagnosis of autism, which the parties expected to be completed by the end of May 2021.  N.T. Termination Hearing, 5/18/21, at 50.  When CYS first encountered Child, CYS placed Child with maternal aunt and uncle as emergency caregivers.  *Id.* at 37.  Child was nonverbal and not potty trained.  *Id.*  Child did not yet have any formal diagnosis, but had many sensory concerns with food, clothing, and different types of material.  *Id.* at 37.  Child's emergency caregivers made efforts to bring Child to medical appointments to receive a diagnosis, but because they did not have legal custody of Child, scheduling Child's medical appointments proved difficult when Mother was not available to attend the appointments as well.  *Id.* at 38. On March 24, 2020, the emergency caregivers notified CYS that they were undergoing divorce proceedings and could no longer care for Child.  *Id.*  CYS then placed Child with Pre-Adoptive Parents where Child remained through
*(Footnote Continued Next Page)*

and appropriate housing; and, address Father's perpetration of domestic violence. *Id.* at 30-34.

Emily Normand, a parenting coordinator employed by Alternative Behavior Consultants (ABC) and assigned to Father's case through CYS's Family Service Plan, testified at the termination hearing that Father did not successfully complete his scheduled programming through TIPS.[4] Normand testified that she met with Father nine times between May 30, 2020 and July 28, 2020, and that he was cooperative and attended the sessions as scheduled. *Id.* at 20. Normand testified that Father's training goals included child development, stress management, parenting children with a mental health disorder, and accessing community resources. *Id.* at 21. Normand testified that Father did not successfully complete the TIPS program because:

> there was a police phone call that was made regarding [new allegations of] domestic violence to [Mother], and at that time, the major concern that I had with [Father] was not necessarily his behavior in sessions with me at ABC, but his behaviors and parenting outside of ABC. I can give you an example. [Father] seemed to lack insight regarding his behaviors of previous domestic violence. He often failed to take accountability for his

the termination hearing. *Id.* Child is still nonverbal, but uses a tablet with images to communicate and is bonded with Pre-Adoptive Parents, who have identified that Child enjoys racecars and certain foods. *Id.* at 38, 56. At the time of the termination hearing, Pre-Adoptive Parents had scheduled Child to enroll in specialized kindergarten for the following fall. *Id.* at 32, 50. Child additionally receives both speech therapy and occupational therapy three days a week and four half-days a week. *Id.* at 50.

[4] The TIPS program consists of ten parenting education classes. Upon successful completion of the TIPS program, the participant is able to advance to the more intensive SKILLS program for reunification services. N.T. Termination Hearing, 5/18/21, at 23.

actions and the effect and impact that that had on [Child]. [Father] was untruthful in regard to his relationship with [Mother] during our parenting sessions and [Father] changed his TIPS sessions with me so that he could have the same schedule as [Mother] when she had visitation at ABC in Carlisle, and he was untruthful about that. They would drive together and he would show up ten minutes either before [] or after [Mother would], and when he was caught [], he reported that he would just do whatever needed to be done to get through this process and would have a relationship with [Mother] as soon as all of "[']you people' are out of our lives." And that statement was an indication that [Father] was not taking accountability for his actions and that[,] although he was present in education, [] parenting services would not be effective for him.

\* \* \*

[O]ur stance at ABC was that parenting services were just deemed ineffective [for Father] because he was unable to really account for how his behavior affected [Child], how his behavior would affect [Child] in the future, and at the time, [Father] had exhausted[,] as far as I can remember[,] all other resources in regard to domestic violence relationships[. A]t that point our stance was[ that Father] needed to end services as they were not effective.

*Id.* at 21-22. Normand also testified that she observed Father and Child interact on at least two occasions, that Father was bonded with Child and attentive to Child's needs, but that when ABC offered Father the opportunity to schedule unsupervised visits with Child, Father never exercised that option, and continued to only visit with Child during ABC's scheduled supervised visits. *Id.* at 24.

CYS case manager, Korin Hays, also testified at the termination proceedings and informed the court of Father's progress on his FSP goals. With regard to Father's goal of improved parenting, Hays testified that between February 6, 2020, and September 9, 2020, CYS offered Father 25

visits with Child at ABC, but that Father attended only sixteen of the visits, for a 64% attendance rate,[5] and was on time for only 67% of those visits. *Id.* at 30. Hays further testified that when Father was given the opportunity to see Child for unsupervised visits, the only time Father did so, in July of 2020, Father took Child to a birthday party where Mother was also in attendance, which was a violation of CYS's no-contact rule and the terms of Father's probation. *Id.* at 31. As a result of that incident, CYS discontinued unsupervised visits for both of Child's biological parents. *Id.*

With regard to Father's substance use, Hays testified that Father was compliant with the Restorative Sanction Program and provided zero positive drug tests over a period of six months. *Id.* at 32. However, Father was arrested in Perry County in October 2020 on drug paraphernalia charges. *Id.*

Regarding Father's goal of attending Child's medical appointments, Hays testified that Father did not attend any appointments through the life of CYS's involvement in Child's case, did attend one of Child's Individualized Education Program (IEP) meetings, via Zoom teleconference, on September 14, 2020, but did not assist in the "planning of th[e] further IEP meetings or

_____

[5] Hays testified that Father missed two consecutive visits at ABC without prior notification. N.T. Termination Hearing, 5/18/21, at 30. Father took issue with those characterizations during his own testimony, and explained that "one of the ['no call, no shows'] I know for a fact was due to being . . . arrested in Perry County for the paraphernalia charge," and the other, "I think I got a flat tire and didn't have a phone on me, like, so I mean, like, I made every attempt to get to my son as much as possible." *Id.* at 70.

[educational] decisions" necessary for placing Child "into a specialized kindergarten program this fall." *Id.*

As for Father's goal of obtaining stable and appropriate housing, Hays testified that Father has been unsuccessful insofar as Father, since his release from York County Prison in November of 2019, stated to Hays that he was not in a place to care for Child, did not have a stable address at that time, and never provided any reunification home through the life of the case. *Id.* at 32-33. Hays further testified that Father's inability to stay out of jail and his lack of communication about his location also affected his ability to maintain a permanent address. *Id.* at 35. Indeed, Father was incarcerated at the beginning of this case, then again from October 2020 through December 2020, and a third time[6] from February 9, 2021 through the May 18, 2021 termination hearing, with a scheduled maximum release date of August 23, 2021. *Id.* at 32-33, 65. Father estimated that he was incarcerated for approximately 188 days during the fifteen-month life of this case. *Id.* at 74. Hays also testified that Father's phone numbers changed quite often and that she relied on Mother for updates on Father's whereabouts. *Id.* at 35.

---

[6] Father's February 9, 2021 incarceration was "for the third probation violation[,] specifically for his contact with [Mother]." N.T. Termination Hearing, 5/18/21, at 48.

- 6 -

Finally, relating to Father's goal of addressing his domestic violence issues, Hays testified that CYS requested that Father complete the AMEND[7] domestic violence and services program "at least two or three times, [but Father] did not engage in that program." *Id.* at 33. Hays additionally testified that she was aware of several allegations of domestic violence committed by Father against Mother during the life of this case, including incidents on February 19, 2019, and July 21, 2020.[8] *Id.* at 33. Additionally, Hays testified that Father struggled to comply with the no-contact rule with Mother because CYS was aware that Father attended some of Mother's unsupervised visits with Child. *Id.* at 36.

_____

[7] AMEND is a "26 session intervention group [] offered to men who are violent and abusive in their personal relationships. AMEND is self-sustaining, as men pay fees on a sliding-scale fee." *See* https://www.dvscp.org/services/ (last visited Nov. 15, 2021).

[8] Father took issue with the allegations and testified that:

> [T]hey [mentioned] bruises and scratches on [M]other. Well, she was helping move some boxes and furniture and stuff in a storage shed to this little apartment that they said was a hotel. It was like an efficiency. I didn't touch her. I mean, she even said, like, these bruises and scratches are from jumping over boxes and trying to find bags of clothes and rooting around in this storage shed. It's like[,] that's a crazy accusation, like I learned, [] back in November of 2018 when I got these original charges and took that Thinking for a Change class and like it's—yeah. It's where I'm at. I wouldn't touch a woman to save my butt. Like, there's no way. It's not worth it. Look how many times I've been in here on that same charge. Like, that's 700 days of my life gone. Like, I'm not doing anything like that again.

N.T. Termination Hearing, 5/18/21, at 72.

Amanda Sigrist, another CYS caseworker assigned to Child's case, testified that Father, while currently incarcerated, has participated in the Thinking for a Change program, but that this program was not specifically tailored towards domestic violence but "making better choices in general." *Id.* at 53-54. Further, Sigrist testified that she has only been able to communicate with Father on a limited basis via letters since the time of Father's re-incarceration. *Id.* at 54.

Father also testified at the termination hearing. Father explained that, upon his release from his current period of incarceration, he intended to move into his sister's residence in Camp Hill and then reunite with Child. *Id.* at 65-66. His plan was to resume work as a shop foreman in Boiling Springs, Cumberland County. *Id.* at 74. Father additionally testified that, regarding his inconsistent presence around Child, the nature of his employment kept him busy and out-of-town:

> [T]he job I was working, I didn't have set hours. It was construction. I was out of town a lot doing a lot of line painting, and you never know when you were going to be back that day. So[,] I mean, that did [have an] effect sometimes because I'd be way up north[,] or down in Virginia . . . painting lines for Giant grocery stores.

*Id.* at 70. Moreover, Father explained why he discontinued the TIPS program:

> It was the ninth visit [at TIPS], and [] I was told ["W]ell, you have two other kids[." L]ike[,] I can just dispose of [Child], like oh, well, you know, ["I screwed up."] And, [when I said, "]I love [Child's] mother and want to be with her when you guys are out of the picture,["] like they threw that at me like I was some piece of crap. I wanted to be a family, like a mother, a father, and [Child], and they made it totally opposite of what it was; and they

were just kind of like I have no other options from there, but I should take a domestic violence class. Well, you just already told me like[,] I'm pretty much screwed, and now you want me to take a class; but I never received any literature that I recall on any of it. I started doing some research on it, and not long after I was arrested. It was [] September 26th [or] so[,] so I never even got to follow up on it then.

*Id.* at 71. Father also took issue with claims that he lacked a permanent address or consistent phone number, and stated:

my address has been at my mom's and my grandmother's house the whole time[.] . . . [I've had] a consistent [phone] number for 15 years, like I got to looking at the paperwork that she mailed me, and they have the wrong phone number down like, it's like seriously, they have every digit right but the very last digit, so.

*Id.* at 71-72. Finally, Father explained that he was "asking the court [] to give [] some additional time upon [his] release to be able to work on [his] goals[.]" *Id.* at 73.

At the close of testimony, the court-appointed guardian *ad litem* (GAL),[9] Tammy Blackburn, Esquire, addressed the court and opined that:

[T]he testimony that we have all heard today clearly shows that neither of the parents[,] at this point in time[,] are able to take care of [Child] and meet [Child's] basic needs. I do commend mother for consenting to the adoption today. I know that that

_____

[9] Child was represented by GAL, Tammy Blackburn, Esquire, and attorney, Damian DeStefano, Esquire, at the termination hearing. *See* 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and *In re K.R.*, 200 A.3d 969 (Pa. Super. 2018) (en banc), *but see In Re: T.S., E.S.*, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination[]of[]parental[]rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests."). Both attorneys participated in the termination hearing.

was very hard for her to do[,] to really thwart her rights, but I believe it was in [Child's] best interests for her to do so.

[Child] has not been with his parents since October of 2019. That's a very long time for a child of [that] age to be out of the care of [Child's] parents. Meanwhile[, Child] has been with the [Pre-Adoptive Parents] for over a year. [Child] is very comfortable and stable there. They love [Child]. [Child]'s part of their family. [Child]'s bonded with them. [Child] does have the opportunity to remain in contact with [the] biological family[10] in that home and have those relationships fostered over time[,] which I believe is also in [Child's] best interests. [F]ather has shown[,] by his testimony[,] that he does care about [Child]. [Father] loves [Child].

However, I am concerned by what I heard that [Father] is still in denial about the reasons why [Child] is in care in the first place. [Father] denied that he laid a hand on a woman[,] which I believe is objectively untrue, and I don't believe that him being in prison for the foreseeable future is going to allow him an opportunity to be the parent that [Child] needs. The [Pre-Adoptive Parents] have provided all of [Child's] educational needs, physical needs, emotional needs, and special needs. They make sure that [Child]'s [well-]taken [] care of in their home, and I believe that it is in [Child's] best interests for the goal to be changed to adoption and for parental rights of both parents to be terminated today.

*Id.* at 77-78.

At the conclusion of the May 18, 2021 termination hearing, the court

announced its decision to terminate Father's parental rights to Child pursuant

---

[10] Pre-Adoptive Parents testified that they were open to Child maintaining a relationship with Mother, but did not want Father to have contact with Child for the time being. N.T. Termination Hearing, 5/18/21, at 58-60. Nevertheless, Pre-Adoptive Parents agreed that, at some point in the future, if Father or anybody on Father's side of the family wanted to have contact with Child and it was safe and appropriate to do so, that contact would be accommodated. *Id.* at 62.

J-A28013-21

to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b).[11]  Nevertheless, the court

did not enter the decree on the docket until June 24, 2021.[12]  Father filed a

_____

[11] The relevant grounds for termination set forth under section 2511 are as follows:

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

*(Footnote Continued Next Page)*

- 11 -

timely notice of appeal, as well as a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b).

On appeal, Father's court-appointed counsel, Joseph L. Hitchings, Esquire, seeks to withdraw his representation of Father.[13]  Accordingly, we must address whether Attorney Hitchings has properly sought to withdraw from this appeal pursuant to **Anders** and its progeny prior to reaching the merits of Father's appeal.

To withdraw in compliance with **Anders**, counsel must:

(1) petition the court for leave to withdraw stating that after making a conscientious examination of the record and interviewing the defendant, counsel has determined the appeal would be frivolous, (2) file a brief referring to any issues in the record of arguable merit, and (3) furnish a copy of the brief to defendant and advise him of his right to retain new counsel or to raise any additional points that he deems worthy of the court's attention.  The determination of whether the appeal is frivolous remains with the court.

**Commonwealth v. Burwell**, 42 A.3d 1077, 1083 (Pa. Super. 2012) (quoting

**Commonwealth v. Gee**, 575 A.2d 628, 629 (Pa. Super. 1990) (internal

citations omitted).  Additionally, counsel must "attach to [the] petition to

_____

23 Pa.C.S.A. §§ 2511(a)(2), (5), (8).

[12] The Honorable Thomas Placey presided over the termination hearing and announced the decision of the Orphans' Court on the record on May 18, 2021. Judge Placey retired on June 2, 2021, prior to signing an order reflecting his decision in this case.  The Honorable Carrie E. Hyams was then assigned to the case and entered the June 24, 2021 decree and authored the Rule 1925(a) opinion.

[13] On appeal, Father has not responded to Attorney Hitchings' **Anders** brief.

withdraw a copy of the letter sent to [the] client advising [the client] of their rights." ***Commonwealth v. Millisock***, 873 A.2d 748 (Pa. Super. 2005). Our Supreme Court has also clarified that an ***Anders*** brief must:

(1)    provide a summary of the procedural history and facts, with citations to the record;

(2)    refer to anything in the record that counsel believes arguably supports the appeal;

(3)    set forth counsel's conclusion that the appeal is frivolous; and

(4)    state counsel's reasons for concluding that the appeal is frivolous.  Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Commonwealth v. Santiago***, 978 A.2d 349, 361 (Pa. 2009).

Here, we are satisfied that Attorney Hitchings has complied with the procedural requirements of ***Anders*** and its progeny.  Counsel filed a petition to withdraw, certifying that he has reviewed the case and determined that Father's appeal is frivolous.  ***See*** Application to Withdraw, 8/31/21, at 2-5. Counsel also filed an appellate brief on October 19, 2021, which includes a summary of the history and facts of the case, the issues Father might raise, and counsel's assessment of why those issues are frivolous, with citations to the record and to relevant legal authority.  ***See Santiago***, ***supra***.  Finally, counsel sent Father a letter advising him of his rights pursuant to ***Millisock***, ***supra***.  ***See*** Application to Withdraw, 8/31/21, at 7-8.  Because counsel has complied with the requirements of ***In re V.E.***, as set forth in ***Anders*** and ***Santiago***, we must now conduct an independent review of the record to

discern if there are any additional, non-frivolous issues overlooked by counsel.

**See Commonwealth v. Cook**, 175 A.3d 345, 348 (Pa. Super. 2017).

Counsel, on Father's behalf, raises the following issues for our review:

1. Whether the trial court abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that sufficient grounds existed for a termination of [Father]'s parental rights to [Child pursuant to] 23 Pa.C.S.A. § 2511(a).

2. Whether the trial court abused its discretion and committed an error of law in terminating [Father]'s parental rights when the conditions which led to the removal or placement of the child no longer existed or were substantially eliminated, thus contravening [] 42 Pa.C.S.A. §[§] 2511(a), (b).

3. Whether the trial court abused its discretion and committed an error of law in determining it would be in [Child's] best interest to have parental rights terminated, when [Father], if given sufficient time, would be ready, willing, and able to parent the child and provide for [Child's] needs, thus contravening [] 23 Pa.C.S.A § 2511(b).

**Anders** Brief, at 4-5 (unnecessary capitalization omitted).[14]

Our standard of review for an appeal from a decree terminating parental

rights is well-settled:

[W]e are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict.

---

[14] Appellees CYS and Child's legal counsel submitted letters in lieu of briefs in this matter, relying on the Orphans' Court's July 27, 2021 Rule 1925(a) opinion.

- 14 -

We are also aware that[, in] a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing evidence["] the existence of grounds for doing so. The standard of "clear and convincing" evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

Moreover, an abuse of discretion occurs when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias[,] or ill[-]will.

*In re T.F.*, 847 A.2d 738, 743 (Pa. Super. 2004) (citations and quotation marks omitted).

This Court has previously discussed the lens through which the court evaluates the rights of parent and child:

It is universally agreed that the bond of parental affection is unique and irreplaceable. When parents act in accordance with the natural bonds of parental affection, preservation of the parent-child bond is *prima facie* in the best interest of the child, and the state has no justification to terminate that bond. On the other hand, a court may properly terminate parental bonds which exist **in form** but not **in substance** when preservation of the parental bond would consign a child to an indefinite, unhappy, and unstable future devoid of the irreducible minimum parental care to which that child is entitled.

It is important to keep in mind that the essential needs of the child and the responsibilities of the parent must be considered as well as the rights of the parent.

*In re Diaz*, 669 A.2d 372, 377 (Pa. Super. 1995) (quoting *In re J.W.*, 578 A.2d 952, 958 (Pa. Super. 1990) (emphasis in original and added; ellipsis omitted). Additionally, this court has explained a parent's duty to keep the child in his or her care:

- 15 -

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

When a child is placed in foster care, the parent has an affirmative duty to work toward the child's return. *In re Julissa O.*, 746 A.2d 1137, 1141 (Pa. Super. 2000). Moreover, this "affirmative duty," requires the parent to demonstrate willingness to cooperate with CYS to obtain the rehabilitative services necessary for the performance of parental duties and responsibilities. *Id.* (citing *Diaz*, *supra* at 377).

> Before filing a petition for termination of parental rights, the Commonwealth is required to make reasonable efforts to promote reunification of parent and child. However, the Commonwealth does not have an obligation to make such efforts indefinitely. The Commonwealth has an interest not only in family reunification but also in each child's right to a stable, safe, and healthy environment, and the two interests must both be considered.

*In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa. Super. 2006) (citations omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act,[15] which requires a two-step analysis. First, the party seeking termination must prove by clear and convincing evidence that the parent's conduct meets at least one of the grounds for termination set forth in section

_____

[15] 23 Pa.C.S.A. §§ 2101-2938.

- 16 -

2511(a). ***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007). If, and only if, grounds for termination are established under subsection (a) does a court then determine whether termination would be in the best interest of the child, considering his or her developmental, physical, and emotional needs and welfare, pursuant to subsection (b). ***See In re Adoption of S.P.***, 47 A.3d 817, 827-30 (Pa. 2012).

Here, the trial court determined that the statutory grounds for termination under subsections 2511(a)(2), (5), and (8) were met. ***See supra***, at n.11. Upon our review, we agree that, at the termination hearings, CYS proved by clear and convincing evidence that the statutory grounds for termination under section 2511(a)(2) were met.[16]

Under Section 2511(a)(2), the petitioning party must prove, by clear and convincing evidence, that there has been repeated and continued incapacity, abuse, neglect, or refusal which has caused the child to be without essential parental care, control, or subsistence, and that the causes of this incapacity, abuse, neglect, or refusal cannot or will not be remedied. ***In re Adoption of J.J.***, 515 A.2d 883, 889 (Pa. 1986).

Here, the record evidence supports the conclusion that Father's behavior amounted to repeated and continued neglect of Child, ***see J.J.***, ***supra***, because, at the time of the May 2021 termination hearing, Father had not

---

[16] We can affirm the trial court's decision regarding the termination of parental rights with regard to any single subsection of section 2511(a). ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

communicated with Child since October 2020 and never once reached out to Pre-Adoptive Parents while Child has been in their care, opting only to maintain a relationship with Child through occasional ABC-supervised visits. *See Diaz*, *supra*; *K.Z.S.*, *supra*; *Julissa O.*, *supra*. Over the 15-month span of the case, Father was incarcerated three separate times totaling, by his estimate, over 188 days. Father never reached out to Child or Pre-Adoptive Family during those periods of incarceration (and including the time between his release in December 2020 and re-incarceration in February 2021). *In re Z.P.*, 994 A.2d 1108, 1120 (Pa. Super. 2010) (citation omitted) (incarceration does not, in itself, provide grounds for termination of parental rights, but parent's responsibilities are not tolled during incarceration; court reviews whether parent utilized all available resources while in prison to foster/maintain continuing close relationship with child). Father's lengthy periods of absence from Child's life, inability to procure stable housing, and failure to attend to Child's specialized medical needs have deprived Child of the essential specialized care Child requires. *See J.J.*, *supra*.

Moreover, we find no support for Father's arguments that there exists no evidence that the conditions or causes of the incapacity could not or would not be remedied. In fact, the record supports the opposite conclusion insofar as Father did not successfully complete his goals with CYS in parenting, domestic violence, attending Child's medical visits, or locating stable housing,

and was only able to maintain his sobriety.[17]  **See V.E.**, **supra** at 1271

(quoting **J.J. supra**, at 889) ("At a minimum, th[e parent's] 'affirmative duty'

[to work toward the child's return] requires that the parent show a willingness

to cooperate with CYS to obtain the rehabilitative services necessary to enable

the parent to meet the duties and obligations inherent in parenthood.").

Consequently, the court did not abuse its discretion in terminating Father's

parental rights to Child pursuant to subsection (a)(2).  **See T.F.**, **supra**; **L.M.**,

**supra**; **J.J.**, **supra**; 23 Pa.C.S.A. § 2511(a)(2).  Thus, we proceed to our

determination of whether termination would be in the best interest of Child,

considering Child's developmental, physical, and emotional needs and welfare,

pursuant to subsection (b).  **See S.P.**, **supra**.

Subsection 2511(b) states:

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

_____

[17] Father's purported compliance with this goal is questionable, given his October 2020 arrest in Perry County for possession of drug paraphernalia.

This court has previously explained how the court should conduct the termination analysis pursuant to subsection 2511(b):

> Section 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citations and quotation marks omitted).

The trial court evaluated Child's best interests under subsection 2511(b) as follows:

> Father loves [Child] but is incapable of caring for his child. Father's own calculations indicate that over the last year and a half, he has spent more than [188] days incarcerated for drug and domestic violence related crimes. [T]he circumstances that led to [Child's] removal and placement continue to exist. Specifically, Father's addiction fuels his anger management problems, both of which continue unabated, notwithstanding the considerable resources offered to him by [CYS].
>
> While Father is unwell and unwilling to deal honestly with his domestic violence issues, [Child] is left without the crucial parental care and control necessary for [Child's] well-being. The consequences of Father's illness and violence should not be inflicted upon [Child]. [Child] now appears to be in an

- 20 -

environment with proper parenting, with people who are caring, dependable, and dedicated to the promotion of [Child's] development. Unlike [when Child was under] Father['s care], [where Child was without] a home, shelter, or other necessities[, Child] is now in a home that provides a healthy and safe environment.

Father has failed to fully address or correct the addictive behaviors and domestic violence that led to [Child's] removal. This reason alone is sufficient to affirm the termination of parental rights; however, the record is replete with other equally clear and convincing evidence of Father's incapacity to meet [Child's] needs and promote [Child's] welfare. Many opportunities have been given to Father and sadly all have been missed; Father's request for more time is unfair to [Child] and not in [Child]'s best interest.

Trial Court Opinion, 7/27/21, at 6-7.

Here, we conclude that the trial court's decision is supported by the record and discern no abuse of discretion. *See T.F.*, *supra*. Although the court acknowledged the existence of a loving bond between Father and Child, the court reasoned that Child's needs are best attended to by Pre-Adoptive Parents, who also share a loving bond with Child. *See* N.T. Termination Hearing, 5/18/21, at 56. Indeed, our review of the record reveals that Pre-Adoptive Parents have a 40-year-old son with autism and are familiar with the care required by an individual with special needs. *Id.* We agree with the court that an evaluation of the intangibles, such as the love, comfort, security, and stability Child has with Pre-Adoptive Parents, *see C.D.R.*, *supra*, favors termination, by clear and convincing evidence. *See T.F.*, *supra*. *See also Smith Adoption Case*, 194 A.2d 919, 922 (Pa. 1963) ("Parental rights may not be preserved by . . . merely waiting for some more . . . convenient time for the performance of parental duties and responsibilities while others

adequately provide the child with [] immediate and continuing physical and emotional needs.").[18]

Decree affirmed. Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/09/2021

---

[18] In this regard, we find Father's third claim on appeal to be meritless. **See In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa. Super. 2006) ("[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.").